**UNITED STATES of America, Appellee,**

v.

**Samuel HAYNES, Defendant–Appellant.**

No. 577, Docket 93–1372.

United States Court of Appeals, Second Circuit.

Argued Jan. 6, 1994.

Decided Feb. 4, 1994.

---

Howard L. Jacobs, New York, NY, for Defendant–Appellant.

David C. James, Assistant United States Attorney, Brooklyn, NY (Christopher Nicolino, Special Assistant United States Attorney, Garden City, NY, Zachary W. Carter, United States Attorney for the Eastern District of New York, of counsel), for Appellee.

Before: MESKILL, KEARSE, and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

The defendant Samuel Haynes appeals from a judgment entered against him on a jury verdict in the United States District Court for the Eastern District of New York (Platt, C.J.) convicting him of possession of a firearm with an obliterated serial number in violation of Title 18, United States Code § 922(k) (Count I), and making a false statement on an application to purchase a firearm in violation of § 922(a)(6) of the same title (Count II). The jury acquitted Haynes of dealing in firearms without a license (Count III). Codefendant Victor Collins, who was named only in the possession count, was acquitted by the jury.

Haynes raises three contentions on appeal. First, he contends he was prejudiced by being joined for trial with Collins, in view of their antagonistic defenses; second, that the court charged the jury incorrectly on the false statement count; finally, he contends (and the Government agrees) that the Court erred in charging the jury on the possession count by failing to instruct on the need to prove the defendant's knowledge of the obliteration of the serial number.

## The Evidence

*Government's case.* The Government's evidence showed that between May and September, 1991, Haynes purchased numerous guns from Top Guns of Long Island, a gun store operated by John Tedesco and Gary Mangieri. Because of the suspiciously large number of purchases by one who was not a licensed dealer, the store owners had notified agents of the Bureau of Alcohol, Tobacco and Firearms. In making the initial purchases, Haynes had used his true name. On August 20, 1991, he signed a purchase form for a 9mm. semi-automatic rifle in the name Leon Hane, and, for identification, proffered a driver's license in that name.

Some time after this purchase, Haynes brought back one of the .22 caliber rifles he had purchased for repairs. Mangieri and Tedesco noted that its serial number had been obliterated and its barrel cut down. In October, Haynes brought back another .22 for repairs. This one also had had its serial number obliterated. Tedesco contacted ATF agents who arrested Haynes when he returned to the store to retrieve the weapon.

Immediately upon his arrest, Haynes admitted he had purchased guns for resale. He told the agents that the rifle with the obliterated serial number was for another person to whom he expected to deliver it that night. He agreed to make a controlled delivery. He then called the codefendant Collins who came to his house to collect the gun and was arrested.

*Haynes's testimony.* Haynes took the stand in his defense. He acknowledged purchasing all the guns in question but offered an astonishing variety of explanations to rebut the criminal aspects of the transactions. To rebut that he had purchased guns for resale, he asserted that he had purchased for the purpose of collecting and for use at a target club. To explain why he no longer possessed six guns he had bought as a collector, he testified that he kept the first three guns he purchased in the trunk of his car, and lost them when the car was stolen. The loss of these guns led him to buy three more, which he again lost in the same fashion. As to how it was he still had the car, notwithstanding that it was twice stolen, both times

he had found the car, but with the guns gone from the trunk. As to why he had never reported the thefts, it was because the car was uninsured and unregistered, and he feared he would get in trouble if he did so. As to why he kept the guns he collected in his car rather than in his home, it was because he didn't want his father to see them. Although he had bought the guns to use at a gun range, he had never joined a gun range. "I was about to though.... [w]hen my friend here recommended me to a place." Q. "What happened to your friend?" A. "He died."

Haynes acknowledged that in making one purchase at Top Guns he had signed the name Leon Hane. This was because the owner had inexplicably produced a driver's license in that name and had instructed Haynes to sign exactly that way. On leaving the store Haynes had unwittingly taken the spurious license with him. Furthermore, rebutting the charge that he had used the false name in purchasing a *rifle*, he testified that on the date in question he had purchased only ammunition.

Coming to the subject of the rifles with the obliterated serial numbers: About the first occasion, Haynes testified that Collins had asked for the loan of a gun for Collins's protection, and that he had loaned Collins the .22. When it malfunctioned, Collins returned it to him for repair; he took it to Top Guns for service without noticing that the serial number had been obliterated and the barrel shortened. Coming to the second occasion, Haynes testified that he went to Top Guns on October 8, 1992, when he got there the owner put a gun in his hand, and he was promptly arrested.

Haynes explained that his false acknowledgement to the arresting agents of having bought guns for resale was because the agents had threatened him and told him what to say.

Finally, Haynes acknowledged that he had falsely denied signing the name Leon Hane when questioned by the Assistant United States Attorney, but only because he hadn't understood the question.

*Collins's testimony.* The codefendant Collins, who as noted was charged only with possession of the gun with the obliterated serial number, took the stand and testified that on October 5 he had been introduced to Haynes as a gun seller because he was considering getting a gun for his protection after his car had been firebombed. He said that Haynes had showed him a brochure for a .22 which Haynes said would cost him $500–$550 but was not yet available because it needed repairs. Three days later Haynes had beeped him and he had gone over to Haynes's house. Haynes told him there was a problem getting the gun repaired because of the serial number.

On cross-examination by the Government, Collins, whose position was that he was merely exploring the idea of buying the gun and had not decided to do so, asserted that the price had been volunteered by Haynes and had not been requested by Collins. At this point, over Haynes's objection, the court received Collins's post-arrest statement by reason of slight inconsistencies with his trial testimony, including that he had asked the price. Haynes's counsel objected that "I can't cross-examine the statement," to which the Court replied to the effect that the maker of the statement was on the stand and available for cross-examination on the statement. Haynes's attorney then cross-examined Collins on the statement but only on whether he had misrepresented his true name.

### Discussion

1. *Joinder.* Haynes contends the district court committed error in denying his motion for severance. He contends that the antagonism between his testimony and that of his codefendant Collins, as to knowledge of and responsibility for the obliteration of the serial number, rendered the trial fundamentally unfair, requiring severance.

Haynes relies on our holdings and dicta to the effect that severance may be required "when the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant." *United States v. Serpoosh,* 919 F.2d 835, 838 (2d Cir.1990), quoting *United States v. Po-*

*tamitis,* 739 F.2d 784, 790 (2d Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984), quoting *United States v. Carpentier,* 689 F.2d 21, 28 (2d Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983), quoting *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir. 1981). *See also United States v. Tutino,* 883 F.2d 1125, 1130 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990) (severance required when "the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be disbelieved").

The principal problem with Haynes's argument is that the authorities on which he relies were recently overruled by the Supreme Court. In *Zafiro v. United States,* —— U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the Court makes clear that "[m]utually antagonistic defenses are not prejudicial *per se.* Moreover, Rule 14 does not require severance even if prejudice is shown; rather it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id.* at ——, 113 S.Ct. at 938. The Court explains that joint trials of defendants properly joined in an indictment are preferred in the federal system because joint trials promote efficiency and "serve . . . justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* at ——, 113 S.Ct. at 937. The testimony of a codefendant implicating the defendant, furthermore, not only is relevant but is likely to be received where there has been a severance (as commonly happens where the codefendant has made a cooperation agreement, or if the codefendant has no further privilege under the Fifth Amendment by reason of a prior acquittal or conviction or immunization order). "[W]e see no reason," the Court states, "why [such] relevant and competent testimony would be prejudicial merely because the witness is also a codefendant." *Id.* at ——, 113 S.Ct. at 938.

The Supreme Court concludes that severance is justified (in the district court's discretion) not because of antagonistic defenses, but rather where joinder would "compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," *id.,* for example, when prejudicial matter is received that is admissible against some but not all of the trial defendants.

■ Haynes can claim no such prejudice. Although he was implicated by his codefendant Collins's testimony, this was relevant competent evidence, and would have been received against Haynes, in any event, if Collins had cooperated.

We note a further reason why Haynes can show no prejudice on this appeal. Collins's testimony related only to Count I charging possession of the gun with the obliterated serial number, on which count Haynes's conviction must be reversed by reason of an error in the charge. This testimony had no bearing on the conviction for furnishing false identification in connection with the purchase of the semi-automatic. Even if it had been prejudicial on the trial of Count I, it would not require reversal of the conviction on Count II.

Even assuming, furthermore, that under the new *Zafiro* standard there may be instances where, by reason of extreme prejudice, denial of severance would be an abuse of the district judge's discretion, this was clearly not such a case. Haynes's own testimony was so obviously contrived and incredible that he contributed to his own incrimination at least as potently as Collins did.

■ 2. *Jury instructions on the false statement count.* Haynes contends the trial judge erred in instructing the jury on the false statement count by charging, in response to a jury question, that the purpose of the statute was to insure that the Government received accurate information as to who were the purchasers of guns. We disagree.

Initially, Chief Judge Platt charged, with respect to the fourth element of Count II, that the false statement must have been "intended or likely to deceive the dealer with respect to any fact material to the lawfulness of the sale." He continued:

I charge you that a misrepresentation as to name is material under this law; since another section makes the sale unlawful unless the seller records, among other

matters, the name and age of the purchaser. The fact that a person could lawfully obtain a firearm under his true name and age does not make his giving a false name and age immaterial. It is no defense with respect to this element that a person may have been eligible to acquire the firearm. A person who is eligible to acquire a firearm must nonetheless properly identify himself by name and age, among other matters.

Under this fourth element, the government must prove that a false statement with respect to a fact material to the lawfulness of the purchase of the firearm was either intended to deceive the seller or was likely to deceive the seller. The fact that the seller may not have actually been deceived is of no consequence.

It is the purchaser's purpose or the transferee's purpose, the intent with which he acted, or the likelihood that the alleged misrepresentation would deceive the seller that you are called upon to resolve.

This charge was twice substantially repeated in response to jury requests for repetition of the elements of the various charged offenses. The jury then sent another note requesting clarification of "intent to deceive" and "likely to deceive."

The court discussed with counsel the likelihood that the jurors were confused because the dealer, with whom Haynes had dealt several times prior to the false name purchase, knew Haynes's true identity. The court proposed explaining to the jury that the purpose of the statute was to insure that government agents would find accurate records at the dealer's premises identifying gun buyers. Haynes's attorney noted his objection. The court then gave further instructions to the jury which included the following:

> [T]he reason why Mr. Tedesco, the [T]op [G]un man, has the forms is because they are government forms. And they are for the purpose of the government being able to know who buys guns. It is not [for] the purpose of the shop keeper. Ultimately this information is there for the purpose of the government inspectors, like the ATF agents we heard testimony from, so they

would be able to determine on behalf of the government who the transferees of these guns are.

The court concluded this supplemental instruction by repeating the government's obligation to prove that the false statement was intended by the defendant to deceive the dealer or likely to deceive the dealer, regardless whether it in fact deceived the dealer.

We find no error in these instructions. In the first place, contrary to Haynes's contention, this supplemental instruction did not eliminate the statutory requirement of intent to deceive the dealer or likelihood of deceiving the dealer. That element, as noted, was repeated at the conclusion of the supplemental instruction. Secondly, there was no error in the supplemental instruction. All it did was to explain the purpose of the dealer's statutory recordkeeping requirements. The Senate Report on this statute confirms that the purpose of requiring firearms dealers to obtain such information from purchasers is "to assist [State and local authorities] in law-enforcement activities." S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2168. The Supreme Court has put it that the statute made the licensed firearms dealer "[t]he principal agent of federal enforcement" in the control of firearms transactions. *Huddleston v. United States,* 415 U.S. 814, 824, 94 S.Ct. 1262, 1268, 39 L.Ed.2d 782 (1974).

■ 3. *Knowledge of the obliteration of the serial number.* At the Government's request, the court charged the jury "that the government need not prove that the defendant ... knew that the serial numbers were removed ..., but only that the defendant ... knowingly possessed a firearm that was in such condition." The Government now concedes this was error.

In 1986 Congress enacted the Firearms Owners' Protection Act, which modified the penalty provisions of 18 U.S.C. § 924. Pub.L. No. 99–308 § 104, 100 Stat. 456 (1986). Where the preexisting statute had provided criminal penalties for "[w]hoever violates any provision of this chapter," 18 U.S.C. § 924(a) (1986), the amended version, insofar as here relevant, imposes criminal

penalties on "whoever *knowingly* violates subsection ... (k) ... of section 922." 18 U.S.C. § 924(a)(1)(B) (1988) (emphasis added).

As the Fifth Circuit recently held in *United States v. Hooker,* 997 F.2d 67, 72 (5th Cir.1993), the 1986 amendment makes clear that the defendant must know of the obliteration of the serial number to be liable for the statute's criminal penalties. The erroneous instruction was unquestionably prejudicial to Haynes as he had admitted in his testimony that he possessed the weapon but denied awareness of the obliteration. The conviction on Court I accordingly must be vacated.

### Conclusion

The judgment of conviction on Count II is affirmed. As to Count I, the judgment of conviction is vacated and the matter remanded to the district court.