**UNITED STATES of America, Plaintiff,**

**v.**

**Donald FERRARINI, Bruno Rumignani, A. Michael Kagan, Howard Miller, and Everett Vieira, Defendants.**

**No. 97 CR. 950(DLC).**

United States District Court, S.D. New York.

June 12, 1998.

Mary Jo White, United States Attorney, Southern District of New York, New York, NY, Robert S. Khuzami, Assistant United States Attorney, for U.S.

Mitchell A. Golub, New York, NY, for Defendant Donald Ferrarini.

Larry H. Krantz, Krantz & Berman LLP, New York, NY, for Defendant Bruno Rumignani.

David M. Richman, New York, NY, for Defendant Donald Kagan.

Alan R. Kaufman, Buchwald & Kaufman, New York, NY, for Defendant Everett Vieira.

Richard D. Weinberg, Morvillo, Abramowitz, Grand, Iason, & Silberberg, P.C., New York, NY, for Defendant Howard Miller.

## OPINION

COTE, District Judge.

This case, for which the Grand Jury returned an indictment on September 25, 1997, and a superseding indictment on January 8, 1998, concerns allegations of various crimes arising out of the operation of Underwriters Financial Group, Inc. ("Underwriters"), a publicly traded company which collapsed in the summer of 1995, and two of its subsidiaries, BRI Coverage Corporation and UFG International, Inc. (collectively "UFG"), through which Underwriters operated its insurance brokerage business. As an insurance broker, UFG, among other things, obtained insurance policies for its customers and arranged financing for customers to help them pay their insurance premiums. The defendants Donald Ferrarini, Bruno Rumignani, and Howard Miller served as President, Executive Vice–President, and Senior Vice President, respectively, of Underwriters and UFG, and defendant Everett Vieira was employed by UFG to perform various functions, including serving as a financial consultant. Defendant Michael Kagan was the Senior Vice President of CPF Premium Funding, Inc. ("CPF"), a company which loaned money through UFG to UFG's customers for the purpose of paying premiums. For the sake of simplicity, this Opinion will refer solely to Underwriters when describing the activities—many of which were undertaken through UFG—which are the concern of this indictment.

At the present time, the defendants in this action have separately filed motions seeking (1) severance of their trials pursuant to Rules 8 and 14, Fed. R. Crim. P., (2) the dismissal of certain counts in the indictment, and (3) the production of a Bill of Particulars and various evidence in the custody of the Government. For the reasons set forth below, the defendants' motions are denied.

## I. BACKGROUND

The first count of the eighty-six count superseding indictment (hereafter, the "indictment") alleges a conspiracy, in which all of the defendants participated, with four objects: mail fraud, insurance fraud, securities fraud, and the making of false statements to the SEC. Put most simply, the defendants are charged with having fraudulently procured loans for Underwriters; misappropriated customers' premium payments; and misrepresented to the SEC Underwriters' financial condition, all in an effort to obtain badly needed operating funds for Underwriters and to disguise Underwriters' true financial condition.

The indictment charges that from June 1993 to April 1995, the defendants fraudulently obtained for Underwriters 37 loans totaling approximately $12.8 million from three finance companies, including CPF. In furtherance of this scheme, the indictment alleges that the defendants Ferrarini, Rumignani, Miller, and Vieira submitted phony finance applications to the lenders. Kagan allegedly abused his fiduciary position at CPF by accepting some $425,000 from Underwriters in order to induce CPF to approve the loans to Underwriters.

The defendants are further charged with having misappropriated customers' premium payments for legitimate loans. At the time Underwriters went out of business in 1995, it is alleged to have misappropriated over $6.0 million altogether in customer premiums owed to various insurance companies. According to the indictment, the defendants initially appropriated premiums which had been held for nine months or longer and thus appeared to have been overlooked. By 1993, Ferrarini, Rumignani, and Miller allegedly began to misappropriate current customers'

payments as well as aged payments. The defendants' alleged recordation of the fraudulent loans and the misappropriated customer payments as income to Underwriters—and their concealment of the company's liability to repay those funds—on financial statements filed by Underwriters with the SEC give rise to the securities and false statements charges.

Each of the defendants also is charged with substantive crimes arising out of the conspiracy. Ferrarini, Rumignani, and Miller are charged with one count of securities fraud and six counts of making false statements to the SEC, the latter series of counts all being tied to filings of forms 10–K and 10–Q. Ferrarini and Rumignani are charged in thirty-seven counts with mail fraud in connection with the mailing of documents as part of the scheme to defraud premium finance companies. Vieira is named in two of those counts; Kagan in twenty-seven; and Miller in nineteen. Ferrarini and Rumignani are named in seventeen counts of insurance fraud connected to the embezzlement of funds belonging to Underwriters' customers. Finally, Rumignani, Vieira, and Miller are each charged with one count of making false statements to the United States Attorney's Office during its investigation of UFG.

Two of the defendants are charged with substantive crimes that are not directly related to the conspiracy. Kagan is charged with five counts of mail fraud for engaging in his own financing scheme in which he obtained fraudulent loans from CPF. Ferrarini is charged with thirteen counts of insurance fraud for his alleged embezzlement of approximately $456,600 of Underwriters' funds for his personal use, and three counts of tax evasion for failing to report the embezzled funds as income. The Government has consented to a severance of counts sixty-eight through eighty-three, the embezzlement and tax evasion charges against Ferrarini. Accordingly, these charges against Ferrarini will be severed and will not be discussed further. The Government therefore seeks to try the five defendants together on a seventy count indictment.

## II. DISCUSSION

### A. Severance

 There is a preference in the federal system for the joint trial of defendants who have been indicted together. *See United States v. Miller,* 116 F.3d 641, 679 (2d Cir. 1997), *cert. denied,* — U.S. ——, 118 S.Ct. 2063, 141 L.Ed.2d 140 (1998). In order to prevail on a motion for severance, a defendant must demonstrate not simply that he will be prejudiced by a joint trial, but that "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Such risks occur, for example, when evidence admissible against one defendant alone leads a jury to conclude erroneously that another defendant is guilty or when "essential exculpatory evidence" is unavailable at a joint trial but available if a defendant is tried alone. *Id. See also United States v. Walker,* 142 F.3d 103, 110 (2d Cir. 1998).

In moving for separate trials, Kagan, Miller, and Vieira argue that they will be prejudiced by a joint trial because they were relatively minor players in the conspiracy. In addition, they argue that they will suffer from "spillover prejudice" on account of the evidence of other crimes that will be introduced against their codefendants. Kagan also argues that his trial must be severed from that of his codefendants because his defense requires their testimony, which will be unavailable at a joint trial. Finally, Ferrarini, Rumignani, Vieira, Kagan, and Miller all argue that they are entitled to a severance because their defenses are antagonistic with those of other defendants. Ferrarini seeks severance from Vieira; Vieira seeks severance from Ferrarini and Rumignani; Kagan seeks severance from all of the other defendants; and Miller and Rumignani seek severance from Kagan.

### 1. Severance for "Minor Players"

 In support of his argument that he is a minor player in the conspiracy charged in the indictment and will be harmed through spillover prejudice, Kagan points out that he is named in thirty-three of the seventy counts in the indictment, and that there is no allegation that he had any involvement in the scheme to misappropriate insurance premiums from Underwriters' clients or the scheme to obtain premium finance loans from entities other than CPF. Vieira, in turn, points out that he is named in only four of the seventy counts, and also is not alleged to have been involved in the scheme to misappropriate insurance premiums from Underwriters' clients.[1] Miller, who is named in only twenty-eight counts, also claims that he will be prejudiced by a joint trial because he is alleged to have been a relatively small player in the conspiracy.

Summarizing the indictment's allegations against Kagan and Vieira, each of these two defendants is charged with conduct relating to UFG's obtaining insurance premium loans. Kagan, as an employee at CPF, recommended approval of the loans for which UFG applied, which resulted in CPF lending $ 9.38 million. Vieira, a financial consultant at UFG, assisted in obtaining such loans from both CPF and another entity, Imperial. On one or more occasions in February and March 1995, the indictment alleges that the five defendants met at Vieira's home to discuss UFG's increasingly desperate cash-flow situation and the premium finance loans UFG had obtained from CPF. Vieira also is accused of having made false statements about the premium finance loans obtained by UFG from CPF to the United States Attorney's Office during its investigation of UFG. As for Miller, he is alleged to have signed his name on numerous fraudulent loan agreements and misleading SEC filings, as well as a check for $175,000 to Kagan. He also is alleged personally to have attempted to cover up one of the fraudulent loan agreements made in the name of one of Underwriters' clients.

---

1. Vieira also points out that he has been named in only two of the twelve separate crimes that the Government intends to offer as Rule 404(b) evidence.

■ First, it is well established that defendants who played a minor role in a conspiracy may be tried with those who played a larger or dominant role. *See, e.g., United States v. Cardascia,* 951 F.2d 474, 483 (2d Cir.1991); *United States v. Casamento,* 887 F.2d 1141, 1153 (2d Cir.1989). A "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance." *Cardascia,* 951 F.2d at 483. It is not altogether clear from the face of the indictment, however, that either Vieira, Kagan, or Miller properly may be characterized as having only a minor role in the conspiracy. Certainly, as described by the indictment, Kagan's role was critical to the scheme to obtain premium finance loans, since he facilitated Underwriters' obtaining over $9 million of the $12.8 million that it obtained through this scheme and was paid $425,000 for those efforts.

In any event, it is fair to conclude from the structure and scope of the indictment that particularly Vieira, but also Kagan, played a smaller role in the conspiracy than defendants Ferrarini and Rumignani. Miller also may have played a smaller role in the conspiracy than did Ferrarini and Rumignani, but he too was critical to its success. Nonetheless, the case is neither so complex nor so large that appropriate instructions will not suffice to remind the jurors of the need to consider each defendant separately. In any event, as discussed below, even at a separate trial much of the evidence of which these three defendants complain would be admitted. Consequently, this portion of their severance motion properly is denied.

### 2. Spillover Prejudice

Vieira, Kagan, and Miller argue that they will suffer from undue "spillover prejudice" on account of the evidence that will be introduced of other crimes committed by their codefendants. First, these three defendants each urge that the substantive counts arising from the misappropriation of customer premiums should be severed. Second, Miller, joined by Rumignani, has moved for severance of the mail fraud counts brought against Kagan for his embezzlement scheme and of the counts charging Miller, Vieira, and Rumignani with false statements to the United States Attorney's Office.

■ A severance of the counts related to the misappropriation of customer premiums is not warranted since this evidence would be admissible even at separate trials of the moving defendants. As the Second Circuit noted in *United States v. Rosa,* 11 F.3d 315 (2d Cir.1993),

> A defendant's right to a fair trial does not include the right to exclude relevant and competent evidence. Thus, the fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately. Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial.

*Id.* at 341 (internal citations omitted). Here, although Vieira and Kagan are not named in the substantive counts alleging misappropriation of customer premiums and misrepresentations to the SEC, they are alleged to have been part of the conspiracy that gave rise to these crimes. The evidence of these other crimes therefore would be admissible even in a separate trial of Vieira or Kagan. Both of the schemes outlined in the conspiracy count—the scheme to misappropriate insurance premiums and the scheme to obtain premium finance loans—shared a common goal, that is, to obtain monies by fraud for Underwriters and thereby to disguise the true financial condition of the company. That Vieira and Kagan were only involved in one of these two schemes does not mean that proof of the overall conspiracy, and the various means that the conspirators used to achieve the goals of the conspiracy, would not be admissible at their separate trials. *See Miller,* 116 F.3d at 679 (evidence of other, even violent, crimes committed by other defendants admissible against coconspirators); *Rosa,* 11 F.3d at 341. Miller particularly cannot reasonably complain of unfair "spill-

over" prejudice as a result of a joint trial.[2] Miller is alleged to have been a part of both schemes in the conspiracy; therefore evidence concerning both schemes certainly would be admissible against Miller even at a separate trial.

In addition to moving for severance from the other defendants, Miller has moved for severance of counts 63 through 67 of the indictment, which charge Kagan with mail fraud relating to his own scheme to defraud CPF, and counts 84 through 86, which charge Rumignani, Vieira, and Miller,[3] respectively, with making false statements to the United States Attorney's Office during proffer sessions in response to questions about UFG. None of the remaining counts need be severed.

The first group, the counts against Kagan alone, allege that Kagan obtained approximately $284,349 for his own account from CPF by submitting five fraudulent financing agreements between January and August 1994. This is essentially the same thing he is charged with having done in concert with the Underwriters defendants during the period from June 1993 through April 1995. In both schemes—Kagan's alone and the collective scheme—the Government alleges that the funds were obtained in the same manner: by submitting fictitious applications, with forged signatures, to premium finance companies.[4] In the collective scheme, three premium finance companies were targeted, although the bulk of the loans—30 out of 37—were obtained from CPF. Kagan is named only in those counts arising out of the collective scheme in which CPF was defrauded. Thus, the victim of the scheme was the same in both those counts of the collective scheme in which Kagan is named and in Kagan's own scheme; moreover, both schemes occurred during the same period of time.

In order for joinder of offenses to be proper where there are both multiple offenses and multiple defendants, the requirements of Rule 8(b), Fed.R.Crim.P., must be satisfied. *United States v. Cervone*, 907 F.2d 332, 341 (2d Cir.1990); *United States v. Attanasio*, 870 F.2d 809, 814–15 (2d Cir.1989); *United States v. Turoff*, 853 F.2d 1037, 1042–43 (2d Cir.1988). Accordingly, multiple defendants may be tried together where they are alleged to have

> participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Rule 8(b), Fed.R.Crim.P. The Second Circuit has interpreted this requirement to mean that the acts must be "unified by some substantial identity of facts or participants or arise out of a common plan or scheme." *Attanasio*, 870 F.2d at 815 (internal quota-

2. Nevertheless, Miller does make this argument in his moving papers, relying on *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir.1988) and *United States v. Bari*, 750 F.2d 1169, 1178 (2d Cir.1984), for the proposition that he is not a "fully implicated conspirator" and therefore the evidence of the other defendants' actions would not be admissible against him at a separate trial. These cases do not help Miller's cause. In both *Friedman* and *Bari*, the Second Circuit upheld the district court's denial of severance for defendants who were among the least active participants in the charged conspiracy. The Court noted in both cases that "most of the evidence of which [each defendant] complains would have been admissible against him in a separate trial as acts of co-conspirators in the furthering of a conspiracy." *Friedman*, 854 F.2d at 563; *Bari*, 750 F.2d at 1178. Here, the indictment makes plain that Miller is a "fully implicated conspirator," and evidence of acts by coconspirators in furtherance of the conspiracy would be admissible at a separate trial of Miller.

3. Miller has even moved to sever one of the counts in which he is the sole defendant. There is no basis in law for such a motion. This conduct, his alleged false exculpatory statements to the United States Attorney's Office, would be admissible at any trial against him based on the other charges in the indictment.

4. Specifically, the indictment alleges that all of the fraudulent loans were obtained by applying for the loans in the name of a customer, but "care of" the entity that actually received the funds. In the case of the collective scheme, the funds were received "care of" UFG. In Kagan's personal scheme, they were received "care of" Kagan's company, KBC systems. In addition, in both schemes, the applications are alleged to have been submitted without the knowledge or approval of the customers in whose names they were tendered, with the exception of one loan Kagan received for KBC.

tion omitted). Here, the overlap in facts between the Kagan scheme and the collective scheme is considerable. As importantly, however, where the charges are different, instructions will suffice to keep the difference clear in the minds of the jury.

 That the Kagan and collective schemes may not have shared, in all respects, "a common plan," as Miller argues, does not negate the propriety of joinder. Miller contends that, because the collective scheme is alleged to have had as its goal "to keep UFG afloat," the Kagan scheme, which is not alleged to have shared that goal, is improperly joined. This argument fails for two reasons. First, it ignores the fact that Kagan's participation in the collective scheme is alleged to have been driven by the financial benefits that it offered him, including a payment of $425,000. This is the same goal that is alleged to have driven his own scheme. Second, it ignores the fact that Rule 8(b) does not require a common goal or conspiracy. Indeed, as interpreted in *Attanasio,* Rule 8(b) requires only that the counts be connected by common facts or participants *or* that they arise out of a common plan or scheme. *Attanasio,* 870 F.2d at 815. The similarity between the schemes reduces the likelihood of any prejudicial spillover. *Cardascia,* 951 F.2d at 483 (severance not warranted where unrelated evidence was only another bank fraud scheme and not of violent activities).

Moreover, it appears that evidence of these crimes would be admitted at trial even if the acts were not also charged in the indictment. Since the Kagan and collective schemes are so similar, evidence of Kagan's embezzlement scheme would be admissible in any trial against Kagan on the collective scheme as Rule 404(b) evidence tending to prove the hotly contested issues of his intent to participate in and knowledge of the collective scheme. Rule 404(b), Fed.R.Evid. *See Attanasio,* 870 F.2d at 815. Just as a limiting instruction would protect Kagan's codefendants from such Rule 404(b) evidence if it were admitted solely to prove Kagan's intent with respect to the collective scheme, a limiting instruction will protect his codefendants when this evidence is introduced against Ka-

gan to prove the separate charges against him in the indictment.

 Counts 84 through 86, which allege false statements to the Unites States Attorney's Office by Rumignani, Vieira, and Miller, are properly joined for similar reasons. These charges are not unrelated to the activities at the heart of the conspiracy, but stem directly from the defendants' efforts to cover up those activities. *See Turoff,* 853 F.2d at 1044 ("one scheme stemmed from the other—and that link provides a sound basis for joinder under Rule 8(b)"). Accordingly, at a separate trial of these counts, the Government would have to introduce evidence of the underlying conspiracy and fraud counts in order to prove a defendant's motive to lie to the Government and to put the charges in an understandable context for the jury. Moreover, evidence of those activities—and their unlawful nature—would be necessary at a separate trial on the false statement charges to prove the falsity of the defendants' statements that they were not engaged in fraudulent activity. *See United States v. Biaggi,* 909 F.2d 662, 676 (2d Cir.1990) (joinder proper where "[p]roof of one scheme was helpful to a full understanding of the other"). Conversely, even if the false statement charges were severed, the statements themselves would be admissible at the conspiracy trial as admissions of the defendants.

Accordingly, in light of the considerable overlap between the participants and facts in the false statements charges and the rest of the charges alleged in the indictment, the Court finds that joinder is proper. Again, limiting instructions where appropriate will suffice to ensure that the jury considers the evidence and the charges against each defendant separately. *Casamento,* 887 F.2d at 1153.

### 3. Kagan's Need for Coconspirator Testimony

 In addition to claiming that he will suffer from spillover prejudice if he is tried with his codefendants, Kagan claims that he cannot be tried with the others because his defense requires their testimony. In short, counsel for Kagan argues

for Mr. Kagan to establish his defense with respect to why UFG paid him $425,000 requires him to call Messrs. Ferrarini, Rumignani, and Miller, UFG's principals. Based upon my conversations with their lawyers, they are unwilling, under the present circumstances, to testify for Mr. Kagan.

Kagan does not represent that he has received any assurances from his codefendants that they would testify at a separate trial for him, much less than this testimony would exculpate him. Instead, he argues simply that, because they have indicated their present intention not to testify at a joint trial, he may not fairly be tried with them.

█ This argument may be dismissed summarily. As the Second Circuit explained in *United States v. Wilson*, 11 F.3d 346 (2d Cir.1993),

> [i]n deciding whether to grant severance based on the defendant's need to call a codefendant, a district court should consider (1) the sufficiency of the showing that the codefendant would testify at a severed trial and waive his Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the counter arguments of judicial economy; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment.

*Id.* at 354 (internal quotation and citation omitted). Here, there has been absolutely no showing that Ferrarini, Rumignani, or Miller would testify at a separate trial of Kagan or that this testimony would exculpate Kagan.[5] Indeed, there is no reason to believe that any of these defendants would be "any more willing to waive his privilege [against self-incrimination] at a separate trial than at the joint trial." *Id.* In addition, there has not been an adequate showing that the codefendants will not in fact testify at a joint

trial. *See Bari*, 750 F.2d at 1177 ("[s]elf-serving, conclusory statements that exculpatory witnesses will not testify at a joint trial are not adequate to compel severance."). Indeed, Rumignani's counsel indicates that his client presently intends to testify at trial. Further arguing against severance is the fact that Kagan seeks the testimony of his codefendants at least in part to establish a fact not in dispute, to wit, that he was not a part of certain schemes which the Government has alleged were implemented by his codefendants and not by him. On the other hand, to the extent that the defendants would agree to testify about those schemes with which the Government has charged Kagan, it appears that they would incriminate rather than exculpate him. Kagan admits as much when he argues elsewhere that he is entitled to a severance because the defenses offered by Miller and Rumignani will be antagonistic to his defense. Finally, the interests of judicial economy weigh heavily in favor of the joint trial of all of codefendants in the conspiracy. Accordingly, the Court denies Kagan's motion for severance based on his need for the testimony of his codefendants.

### 4. Antagonistic Defenses

█ With respect to the defendants' arguments arising out of their allegedly antagonistic defenses, the Court finds that the defendants have not met their burden of proving that severance is required on this basis. Ferrarini and Vieira have failed to establish that their defenses necessarily are antagonistic to those of the codefendant(s) from whom they wish to be severed. Nor have they established that, even if the defenses are antagonistic, trying the defendants together would compromise a specific trial right. *See Zafiro*, 506 U.S. at 539, 113 S.Ct. 933; *United States v. Haynes*, 16 F.3d 29, 32 (2d Cir.1994); *United States v. Beverly*, 5 F.3d 633, 638 (2d Cir.1993); *United*

---

5. Kagan claims that he needs the testimony of his co-defendants not only for the purposes of their *direct testimony* about Kagan's involvement, but also in order to refute what Kagan anticipates will be the testimony of certain of the Government's cooperating witnesses, Mark Bailine and Frank Palumbo. Kagan assumes that these witnesses *will testify to* "statements that one (or more) of the UFG defendants made, and

that the statements (somehow) implicate Mr. Kagan in the (alleged) conspiracy." Regardless of *the purpose for which* Kagan would like to call his co-defendants, however, he will not prevail on a motion for severance on that basis without first, as a preliminary matter, establishing that they in fact are likely to testify at his separate trial *and that such testimony would exculpate* him.

*States v. Harwood,* 998 F.2d 91, 95–96 (2d Cir.1993). Vieira's counsel has represented that he will argue—"primarily during cross-examination of prosecution witnesses"—that Vieira had a minor role, if at all, in a scheme orchestrated by Ferrarini and Rumignani. Ferrarini has seized on this representation to argue that he and Vieira have antagonistic defenses.

As the Supreme Court observed in *Zafiro,* "[m]utually antagonistic defenses are not prejudicial *per se.*" 506 U.S. at 538, 113 S.Ct. 933. As already noted, a defendant must identify a specific trial right that is jeopardized by the joinder of parties or identify precisely how a jury will be prevented from making a reliable judgment about guilt or innocence. *Id.* at 539, 113 S.Ct. 933. Even where the risk of prejudice from joinder is high, however, "limiting instructions [ ] often will suffice to cure any risk of prejudice." *Id.* Thus, even testimony at trial by a codefendant that is adverse to the moving defendant does not necessarily require severance, so long as the testimony is relevant and competent, and bears on the issue of guilt or innocence. As the *Zafiro* Court held,

> a fair trial does not include the right to exclude relevant and competent evidence. A defendant normally would not be entitled to exclude the testimony of a former codefendant if the district court did sever their trials, and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant.

*Id.* at 540, 113 S.Ct. 933. *See also Haynes,* 16 F.3d at 32. Thus, in a two defendant case, where both defendants took the stand and gave contradictory testimony, the Second Circuit held that the convicted defendant was not entitled to a severance.

> Although [appellant] was implicated by his codefendant['s] testimony, this was relevant competent evidence, and would have been received against [the appellant], in

any event, if [the codefendant] had cooperated.

*Id. See also Harwood,* 998 F.2d at 96 (presentation of mutually exclusive defenses at trial did not require severance given proper limiting instructions).

Based on the record presented by defendants Ferrarini and Vieira, it is not sufficiently clear what defenses they intend to proffer at trial, much less that those proffered defenses will necessarily be antagonistic, such that a jury would have to choose between them. In any event, even if the defenses turn out to be antagonistic, defendants who point the finger at each other nevertheless may be tried together at least where, as here, a limiting instruction will be sufficient to protect the interests of both defendants. The argument for severance advanced by Vieira and Ferrarini based on antagonistic defenses thus is unavailing.

Miller's argument, joined by Rumignani, based on antagonistic defenses with Kagan fails for similar reasons. Kagan's motion for severance, which effectively is the mirror image of Miller's motion, also fails. Miller states that his defense at trial will be that

> he understood the premium financing from CPF to be in the nature of a bridge loan from CPF to UFG. Mr. Miller believed that his codefendant Mr. Kagan—a senior officer, board member and significant stockholder of CPF—arranged for CPF to lend money to UFG through the premium finance applications. Thus, Mr. Miller signed premium financing applications understanding that CPF knew that the funds were to be used by UFG and not UFG's customer.

In contrast, Miller claims that Kagan will argue "that he had nothing to do with UFG obtaining money from CPF."[6] Accordingly, Miller argues that

> acceptance of Mr. Kagan's defense would necessarily preclude acceptance of Mr. Miller's defense .... Moreover, given

---

6. In connection with the bankruptcy proceedings of UFG, Kagan gave a deposition in which he outlined what he and his codefendants all contend will be Kagan's defense at trial—to wit, that Kagan did not play any role in arranging for CPF to offer premium financing to UFG.

In connection with his motion for severance, Kagan has argued that "there is no rational basis for a jury to believe the conflicting defenses that will be proffered by Mr. Kagan, on the one hand, and Messrs. Miller and Rumignani on the other."

these contradictory arguments, the jury may simply find that the only unified and consistent presentation is that of the government and vote to convict all of the defendants.

This argument is unavailing. First, even assuming that Kagan and Miller (joined by Rumignani) in fact adopt the defense strategies at trial that Miller presupposes, the jury need not necessarily conclude that one of them is lying. For example, the jury could conclude that Kagan in fact did not play a role in helping UFG obtain money from CPF, while also finding that Miller and Rumignani believed that he had. Moreover, as set forth above, even if the defenses developed at trial do turn out to be antagonistic, a limiting instruction will suffice to protect the interests of the defendants. Miller's argument that severance is required because the Government may present the only "unified and consistent presentation" simply is unsupported by the law. If Miller were correct, any defendant who presented a defense at odds with that of any other defendant would be entitled to a separate trial. *See Cardascia,* 951 F.2d at 484–85 (were it true that adversarial stances by codefendants required severance, there would be a "virtual ban on multidefendant conspiracy trials"). *Zafiro* clearly holds that this is not the case.

Nor does *United States v. Serpoosh,* 919 F.2d 835 (2d Cir.1990), on which the defendants place heavy reliance, assist their argument. In *Haynes,* the Second Circuit rejected an argument based on *Serpoosh,* noting that it and other similar authorities were overruled by the Supreme Court in *Zafiro.*[7] *Haynes,* 16 F.3d. at 31–32. Accordingly, the Court finds that none of the defendants are entitled to severance on the basis of antagonistic defenses.

### B. *Dismissal of Counts in the Indictment*

#### 1. Count Two

Ferrarini alone has moved to dismiss counts two through eight in the indictment. Ferrarini argues that count two, which alleges securities fraud, should be dismissed be-

cause it fails to assert the requisite elements of a violation under Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5 ("Section 10(b)" and "Rule 10b–5"). The crux of Ferrarini's argument is that, because there is no allegation that any of the defendants ever purchased or sold Underwriters' securities, or that connects the alleged false statements about Underwriter's financial condition to a purchase or sale of securities, the indictment is insufficient. This argument is without merit.

Section 10(b) provides, in pertinent part,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... to use or employ, *in connection with the purchase or sale of any security* registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1997) (emphasis added). Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, *in connection with the purchase or sale of any security.*

17 C.F.R. § 240.10b–5 (emphasis added).

In terms of meeting the pleading requirements in this Circuit, count two of the

---

**7.** In any event, the defendants have not demonstrated that the antagonism between their defenses rises to the level of conflict discussed in *Serpoosh.*

indictment is plainly sufficient. As the Second Circuit recently held,

> [i]t is well settled that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."

*United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir.1998) (quoting *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)). To be legally sufficient, an indictment "need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime." *United States v. Grossman,* 843 F.2d 78, 84 (2d Cir.1988) (quoting *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.1975)). *See also Hamling,* 418 U.S. at 117, 94 S.Ct. 2887 ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself . . . ."); *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.1992). Here, count two conspicuously tracks the language of Section 10(b) and gives notice of the time and place of the alleged crime. Count two reads, in pertinent part,

> From in or about 1993 through in or about May 1995, in the Southern District of New York and elsewhere, DONALD FERRARINI, BRUNO RUMIGNANI, and HOWARD MILLER, the defendants, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and of the mails, did use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b–5, by (1) employing devices, schemes, and artifices to defraud; (2) obtaining money and property by means of untrue statements of material fact and by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in transactions, practices, and courses of business which operated and would operate as a fraud and deceit *in connection with the purchase and sale of the common stock of Underwriters Financial Group.*

(Emphasis added). The foregoing allegations, which track the language of Section 10b and explicitly invoke Rule 10b–5, provide sufficient notice to the defendants of the crimes with which they are charged.

Indeed, Ferrarini does not argue that the indictment provides inadequate notice of the crimes charged under count two. Instead, he argues that the indictment is insufficient because there is no allegation directly tying the defendants to a purchase or sale of securities. Ferrarini claims that Section 10b requires a "causal nexus . . . [to] fulfill[ ] the 'in connection with' portion of Section 78j(b), between the alleged scheme and the purchase or sale of securities connected with it." While Ferrarini is correct that there must be some connection between the defendants' conduct and the purchase or sale of securities, there is no requirement, such as he suggests, that the defendants themselves purchased or sold securities.

 As the Second Circuit noted in *United States v. Russo,* 74 F.3d 1383 (2d Cir.1996),

> [t]he Supreme Court has interpreted Section 10(b) and Rule 10b–5 expansively in accordance with congressional intent to minimize fraud in securities trading. . . . The purpose of the Section and its implementing regulations is to prevent fraud, whether it is "a garden type variety of fraud, or present[s] a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

*Russo,* 74 F.3d at 1390 (quoting *Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 11 n. 7, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)). The Court has also held that Section 10(b) and Rule 10b–5

> embrace a "fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry."

*Id.* (quoting *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). In light of the forego-

ing, it is well established that a violation of Section 10(b) may be predicated on any action that "touches" the purchase or sale of securities. *See Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. at 12–13, 92 S.Ct. 165; *Russo*, 74 F.3d at 1391. There is no requirement that an individual defendant actually buy or sell securities. *See United States v. Persky*, 520 F.2d 283, 288 (2d Cir.1975); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir.1968) (en banc). Liability for violations of the securities laws can flow from the "dissemination into the marketplace of false or misleading information," *In re Ames Dep't Stores, Inc. Stock Litigation*, 991 F.2d 953, 961–62 (2d Cir.1993), including the making of false statements on annual reports filed with the SEC.[8]

■ Here, the indictment alleges that Ferrarini and Rumignani filed reports with the SEC "for 1993, 1994, and the first quarter of 1995" which misrepresented the value of UFG. The defendants thus are alleged to have presented an inaccurate picture of UFG's assets and liabilities to the SEC and the public. Such conduct clearly falls within the broad range of manipulative or fraudulent conduct prohibited by the securities laws. *See id.* at 962 (quoting *Superintendent of Ins.*, 404 U.S. 6 at 12, 92 S.Ct. 165, 30 L.Ed.2d 128 ("[s]ection 10(b) must be read flexibly, not technically and restrictively")). Viewed in the context of the entire indictment, which sets forth, among other facts, the fact that "Underwriters was a public corporation trading on a national securities exchange," count two of the indictment, which charges the defendants with causing false or misleading information to be filed with the SEC, is legally sufficient.

**2. Counts Three Through Eight**

■ Next, Ferrarini argues that counts three through eight, which allege false statements to the SEC, should be dismissed on the ground that the charged false statements to the SEC do not constitute a violation of 18 U.S.C. § 1001 ("Section 1001"), which prohibits making false statements to any agency within the Executive Branch. Ferrarini argues that the SEC, as an independent regulatory body, is not a part of the Executive Branch. Although the question of whether the SEC is an agency within the meaning of Section 1001 is not a close one, it does appear to be one that the Second Circuit has not previously addressed.

As in effect at the time of the offenses charged in the indictment,[9] Section 1001 provided in pertinent part that it was a crime for a person

> in any matter within the jurisdiction of any department or agency of the United States [to] knowingly and willfully falsif[y], conceal[ ] or cover[ ] up by any trick, scheme, or device a material fact, or make[ ] any false, fictitious or fraudulent statements or representations . . . .

18 U.S.C. § 1001 (1994). Relying on *Hubbard v. United States*, 514 U.S. 695, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995), which held that Section 1001 did not criminalize false statements to a federal court since a "federal court is neither a 'department' nor an 'agency' within the meaning of § 1001," *id.* at 715, 115 S.Ct. 1754, Ferrarini argues that the SEC also is not a department or agency within the meaning of Section 1001.

In *Hubbard*, the Supreme Court overruled an earlier case, *United States v. Bramblett*, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955), to narrow the reach of Section 1001.

---

8. The one case binding on this Court that is cited by Ferrarini in support of this portion of his argument, *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 265 (2d Cir.1984), is completely inapposite. In that civil case, the Second Circuit upheld the dismissal of claims for securities fraud brought by individuals who claimed that they had a contract with the defendant corporation to purchase the shares of its subsidiaries. The Court found that the plaintiffs did not in fact have such a contract, and could not maintain a securities fraud suit because they had neither purchased nor sold shares. The purchase or sale

requirement referred to in *Reprosystem* does not apply in the situation presented in the present action, in which the defendants are accused of having filed false information with the SEC that could have affected the price of shares bought or sold by others.

9. Section 1001 was amended in 1996 to criminalize false statements made "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." 18 U.S.C. § 1001(a) (1998).

In *Bramblett*, the Court had held that Section 1001 criminalized false statements made to a court, despite the fact that a court is not normally considered a "department" or "agency" of the United States government. In overruling *Bramblett*, the *Hubbard* Court concluded that *Bramblett*'s holding simply could not be reconciled with the plain language of Section 1001 and of Section 6 of Title 18 ("Section 6"), which provides a default definition for the terms "department" and "agency." Section 6, which was enacted in 1948, provides:

As used in this title:

The term "department" means one of the executive departments enumerated in section 1 of Title 5,[10] unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government.

The term "agency" includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a propriety interest, unless the context shows that such term was intended to be used in a more limited sense.

18 U.S.C. § 6 (1969). Finding that "there is nothing in the text of [Section 1001], or in any related legislation, that even suggests— let alone 'shows'—that the normal definition of 'department' was not intended," 514 U.S. at 701, 115 S.Ct. 1754, the *Hubbard* Court held that Section 1001 could not fairly be read to reach false statements to a court.

In the present case, Ferrarini's motion requires that this Court focus on the second paragraph of Section 6, which defines "agency." *Hubbard*'s holding is limited only to the narrow question of whether a court is a "department" or "agency" within the meaning of Section 1001; it does not address whether an independent regulatory agency such as the SEC is a department or agency. Drawing on the method of statutory construction embraced in *Hubbard*, however, which prioritizes the plain meaning of the words in a statute, *see id.* at 702–03, 115

S.Ct. 1754, this Court must conclude that the SEC is an "agency" within the meaning of Section 6 and therefore Section 1001.

As defined in Section 6, the term "agency" includes an "independent ... commission." As established by the Securities and Exchange Act of 1934 ("the Act"), the SEC was not given the title of "agency" or "independent commission." Nevertheless, its name includes the word "Commission" and the provisions regarding its composition reflect a desire on the part of Congress to ensure the Commission's independence. Those provisions provide in pertinent part that the Commission shall be "composed of five commissioners to be appointed by the President by and with the advice and consent of the Senate," and that "[n]ot more than three of such commissioners shall be members of the same political party." 15 U.S.C. § 78d(a). The Act further provides that "[n]o commissioners shall engage in any other business, vocation, or employment than that of serving as commissioner," and that "[e]ach commissioner shall hold office for a term of five years ...." *Id.* A common sense reading of the foregoing provisions suggests that, in creating the SEC, Congress meant to create an independent commission charged with carrying out the purposes behind the Securities and Exchange Act. Indeed, the substantive provisions of the Act delegate to the SEC broad authority to promulgate and enforce rules necessary to carrying out the Act's purposes.

Consistent with the foregoing analysis of the SEC's status, courts considering the status of the SEC in other contexts have either implicitly or explicitly held that it is an agency for those purposes. *See, e.g., SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 746, 104 S.Ct. 2720, 81 L.Ed.2d 615 (1983) (discussing the authority of the SEC "and other agencies" to issue and enforce administrative subpoenas); *Touche Ross & Co. v. SEC*, 609 F.2d 570, 582 (2d Cir.1979) (discussing the applicability of the exhaustion of administrative remedies requirement to SEC proceedings and implicitly accepting that the SEC is

---

**10.** Section 1 of Title 5 is now covered by Section 101 of Title 5, Government Organization and Employees.

an agency); *SEC v. Republic Nat'l Life Ins. Co.*, 383 F.Supp. 436, 438 (S.D.N.Y.1974) (discussing judicial review of agency action as applied to the SEC); *M. G. Davis & Co., Inc. v. SEC*, 252 F.Supp. 402, 403 (S.D.N.Y.1966) (holding that the SEC "is an agency of the United States Government and, as such, may not be sued in evasion of sovereign immunity"). In *United States v. Bilzerian*, 926 F.2d 1285, 1300 (2d Cir.1991), which was decided before *Hubbard* and concerned a Section 1001 prosecution for false statements to the SEC, the Second Circuit did not address explicitly its determination that the SEC was an agency within the meaning of Section 1001 or Section 6. Nevertheless, implicit in the Court's analysis, and critical to its holding, was its assumption that the SEC was an agency within the meaning of those statutes.

 The plain meaning of Section 6 and prior court decisions thus support a finding that the SEC is an "agency" within the meaning of Section 1001. The Court has reviewed the extensive legislative history of Section 1001 chronicled in *Hubbard*, 514 U.S. at 702–07, 115 S.Ct. 1754, and concludes that there is nothing in that history, or any other "context" of Section 1001, to suggest that the SEC should not be considered an agency for the purposes of that statute. The Court therefore concludes that Section 1001 criminalizes false statements to the SEC, and that the defendants may be prosecuted under Section 1001 for the false statements to the SEC alleged in the indictment.

C. *Requests for a Bill of Particulars and Early Disclosures*

1. Bill of Particulars

In addition to his other motions, Ferrarini requests that the Court direct the Government, pursuant to Rule 7(f), Fed.R.Crim.P., to provide him with a bill of particulars. Kagan joins in this motion. Rumignani also requested a bill of particulars but informed the Court by letter dated November 7, 1997, that he believed counsel were able to resolve the request without the Court's intervention. Ferrarini contends that he needs a bill of particulars in order to understand what the Government alleges him to have done with respect to the insurance fraud and mail fraud counts. Kagan contends that the "vagueness" of all of the allegations against him "creates obvious difficulties in determining precisely what Kagan must defend against."

 None of the defendants have made the showing required before the Court properly may direct the Government to provide a bill of particulars. As the Second Circuit held in *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir.1987) (per curiam), the purpose of Rule 7(f) is to permit a defendant

> to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.

*Id.* at 574 (internal citations omitted). Obtaining evidentiary detail is not the purpose of a bill of particulars. *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.1990) (internal quotation omitted). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Id.*

 In this case, the indictment alone—which is forty-four pages long—discloses sufficient information to inform the defendants adequately of the charges against them. It describes in careful detail the nature and goals of the charged conspiracy, the overt acts taken in furtherance of it, and the numerous additional substantive counts with which the defendants are charged. Indeed, reference to the defendants' complaints about the deficiencies in the indictment makes clear that these alleged deficiencies do not rise to the level of uncertainty that would require a bill of particulars. Ferrarini complains that the indictment does not delineate the "specific role" played by Ferrarini in many of the counts, nor specify exactly "what actions were taken by Mr. Ferrarini" with respect to the mail fraud and insurance fraud counts. Kagan nitpicks at verbs and phrases in the indictment such as "pressured" and "causing to be delivered by mail" and claims that they are too vague to provide Kagan the notice he requires to prepare his defense.

Rule 7(f) simply is not implicated by deficiencies on such a minute scale as those cited by the defendants. The indictment provides all of the defendants with the locations and approximate dates in which all of the criminal acts are alleged to have occurred. The lengthy discussion of the background of the conspiracy describes the Government's view of the role each of the defendants played in the overall conspiracy, and the substantive counts set forth in great detail the unlawful acts with which the named defendants are charged. For example, the fraud counts identify the names of the customers and premium financing companies alleged to have been defrauded in each count, along with the approximate amounts by which they were defrauded. Similarly, the securities fraud counts set forth the precise SEC filings that are alleged to have been misleading. Accordingly, finding that the indictment sets forth sufficient information to apprise the defendants of the nature of the charges against them, and to enable them to prepare their defense, the Court denies the motions for a bill of particulars. The Government shall, however, provide the defendants with a list of coconspirators within two weeks.

### 2. Other Discovery Motions

Finally, Ferrarini, joined by certain other of the defendants, has moved to compel early disclosure of certain information in the possession of the Government, including evidence the Government intends to offer pursuant to Rule 404(b), Fed.R.Evid. Noting that the Government provided notice by letter dated May 7, 1998, of evidence it intends to offer pursuant to Rule 404(b), the Court will consider this portion of the defendants' motions as mooted. With respect to all other aspects of the defendants' discovery motions, the Court simply notes that the Government has a continuing obligation to provide discoverable material to the defendants. It appears that the Government has turned over considerable material to the defendants since their motions were filed, and that it recognizes its continuing obligations under Rule 16, Fed. R.Crim. P., and pertinent constitutional requirements. Accordingly, the Court does not find that any orders addressed to the Government's production of discovery are appropriate at this time, particularly since Ferrarini's discovery motion was made in violation of Local Criminal Rule 16.1.

### III. CONCLUSION

With the consent of the Government, counts 68 through 83 are severed. For the reasons set forth above, the Court denies the defendants' remaining motions for severance. The Court also denies Ferrarini's motion to dismiss counts 2 through 8 of the indictment. Finally, the Court denies the defendants' motions for a bill of particulars and to compel early discovery. The Government shall provide the defendants with a list of all coconspirators within two weeks of this Opinion's issuance.

SO ORDERED.