UNITED STATES of America, Appellee,

v.

**Alan E. HARWOOD, also known as Expresso, and Frederick W. McKee, Defendants–Appellants.**

Nos. 958, 1002, Dockets 92–1471, 92–1483.

United States Court of Appeals, Second Circuit.

Argued April 5, 1993.

Decided July 1, 1993.

Thomas A. Zonay, Rutland, VT (John J. Kennelly, Charles C. Humpstone, Carroll, George & Pratt, Rutland, VT, of counsel), for defendant-appellant Alan Harwood.

Colleen P. Cassidy, New York City (The Legal Aid Society, Federal Defender Services Unit, of counsel), for defendant-appellant Robert McKee.

Gary G. Shattuck, Asst. U.S. Atty., Rutland, VT (Charles A. Caruso, U.S. Atty. D. Vt., David V. Kirby, Chief, Crim. Div., Rutland, VT, of counsel), for appellee.

Before TIMBERS, McLAUGHLIN, and WELLFORD,* Circuit Judges.

McLAUGHLIN, Circuit Judge:

Defendants Alan Harwood and Frederick McKee were convicted following a jury trial for possession and conspiracy to possess lysergic acid diethylamide ("LSD") with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1988). McKee was also convicted of distributing LSD, in violation of 21 U.S.C. § 841(a)(1). Harwood was sentenced to 188 months' and McKee to twenty years' imprisonment. Judgments of conviction were entered in the United States District Court for the District of Vermont (Franklin S. Billings, *Judge*).

On appeal, defendants challenge their convictions and sentences on a number of grounds. For the reasons set forth below, we find no basis for reversal, and therefore, affirm in all respects.

## BACKGROUND

During the summer of 1991, the Rainbow Family of Living Light ("Rainbow Family") came together for an annual gathering at the Green Mountain National Forest in Vermont. Federal law enforcement authorities learned that there was widespread drug use at Rainbow Family gatherings; and they launched an undercover operation to investigate the drug dealing.

Undercover agents saw extensive use of LSD, heroin, methamphetamine, cocaine, and marijuana. They learned that a man known as both "Peace Stone" and "Blue Hat" (for his distinctive blue hat) was selling large quantities of LSD. This man, they concluded, was McKee, and at this point they knew nothing of defendant Harwood.

Undercover Deputy U.S. Marshal Andre Labier then tried to buy LSD from McKee. McKee said that he did not have any LSD on him but that there was some in a vehicle which his friend was packing. He then walked toward the parking lot, and returned a few minutes later with LSD. Labier bought 12 "hits" of "critter LSD," paying with a previously marked $20 bill. McKee tore the 12 hits off a larger sheet of LSD, and then walked toward the parking lot carrying the remaining sheet of LSD.

Labier described McKee to the other agents, who then headed for the parking lot in search of McKee. They found him loading a van with the help of two women and Harwood, who it turned out was the owner of the van. In the course of a 15–minute conversation, United States Forest Service Officer Ronald Brouwer discovered that McKee and Harwood had travelled to Vermont together and were now preparing to return to the West Coast.

Concluding that an arrest of McKee in the parking lot might be dangerous because of the number of Rainbow Family members around, the agents decided to wait until the van left the parking lot and to make the arrest on the road. (At this point, the agents believed that they had probable cause to arrest McKee, though not Harwood.) After leaving the parking lot, Harwood, who was driving, suddenly pulled over and the agents decided that this was the time to arrest McKee. They approached Harwood's van with their guns drawn, ordered everyone out (including the two women, Harwood's twenty-two month old child, and a male hitchhiker), and arrested McKee.

The arrest was not textbook smooth. A crowd of 100–125 irate Rainbow Family

* Honorable Harry W. Wellford of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

members gathered to vilify the agents. Recognizing the volatility of the situation, the agents released the women and the child, impounded the van, handcuffed and searched both McKee and Harwood, and took them along with the hitchhiker to a local police command post eight miles away for further questioning. They soon released the hitchhiker, after he answered questions and agreed to a search of his belongings.

Harwood objected that he too should be released because, like the hitchhiker, he was not involved with drugs and hardly knew McKee, was only giving him a ride, and had no other connection with him. He also said that the agents could search him and his van, and that his identification was in a purse in the van. When the agents took him up on his offer and opened the purse, they discovered seven hits of LSD (of the same type that had earlier been sold to Labier). Harwood was then formally arrested, and he and McKee were interrogated separately.

In his first interview, McKee (calling himself "Richard Reynolds") stated that the van he was riding in "has absolutely nothing to do with this" and that he knew "Expresso [Harwood's name in the Rainbow family] briefly." McKee admitted to having brought LSD to the gathering, but he refused to say how much. Harwood said that he knew McKee, only as "Peace Stone," and denied ownership of the LSD in the purse. After the initial questioning, both men asked Forest Service Officer Kathleen Miller about the use of dogs to search "their van," seemed very relieved that the dogs did not find anything, and told her that they worked together in Arizona.

After Harwood's interview, but without a warrant, agents searched his van. The search revealed a Phillips screwdriver lying near a loose panel in the van's rear door which was secured by Phillips screws, one of which was missing. Bending the door panel slightly, the agents spotted something hidden inside and then removed the panel, revealing an express mail envelope containing 605 doses of blotter acid weighing 4.290 grams. Turning to search the side door panels, the agents found another express mail envelope containing 1,462 doses of blotter acid weigh-

ing 10.3 grams, 11,000 sheets of undipped blotter paper, and a gold cigarette case containing .99 grams of pure LSD brown powder. Also found strewn about the interior of the van were two cans with false bottoms which contained over $4,300 in cash, and other express mail envelopes, including one addressed to "Jack Burhead" with McKee's alias "Richard Dean Reynolds" identified as the sender. Federal agents finally obtained a warrant to search the van nearly two weeks after it was seized. During that search, no contraband was found.

During a second set of interviews, McKee—unaware of the agents' discovery in the van—stated that he had placed the LSD in Harwood's purse. When told of the van's stash, Harwood denied that the LSD was his, but acknowledged that he had four or five thousand dollars in "safes" in his van. Both men were indicted for possessing and conspiring to possess LSD with intent to distribute; McKee was also indicted for distributing LSD.

Prior to trial, the district court denied: (1) both defendants' motions for severance, finding that no substantial prejudice would occur from a joint trial; and (2) motions to suppress evidence and statements, finding that, with the exception of the retrieval of Harwood's purse, no search had occurred before the agents obtained a warrant, and that the statements were lawfully obtained. The government then informed the district court that agents had indeed conducted a warrantless search of Harwood's van "after the subjects were taken into custody" on the basis that they had probable cause to believe that contraband was in the van. The district court nevertheless reaffirmed its denial of defendants' motion to suppress the evidence obtained from the conceded search.

Preparing for trial, Harwood's attorney contacted Michael Maynard, a reporter for the *Rutland Herald*, who had interviewed McKee in jail. Maynard informed the lawyer that McKee had admitted that "Harwood was in the wrong place at the wrong time," and "the same would have happened to any person driving a vehicle in which he [McKee] was a passenger." Counsel then subpoenaed Maynard, but he and the *Rutland Herald*

moved to quash on First Amendment and hearsay grounds. At a hearing on that motion, Harwood's counsel argued, *inter alia,* that Maynard had waived any First Amendment right by coming forward and telling defense counsel of McKee's statements. The district court side-stepped the First Amendment claim and granted the motion on the ground that the testimony was inadmissible hearsay.

During trial, the government elicited testimony to support its contention that Harwood and McKee were acting in concert. Harwood's counsel argued that the drugs belonged entirely to McKee, and McKee's counsel argued that the drugs in the van belonged only to Harwood. The jury convicted both defendants on the possession and conspiracy counts and McKee on the distribution count.

Both defendants moved for new trials. Harwood alleged errors in the district court's denial of the motion to sever and in granting the motion to quash the Maynard subpoena. Denying Harwood's post-trial motion, the district court determined "that the existence of inconsistent defenses of the two defendants d[id] not amount to substantial prejudice or miscarriage of justice in the light of the court's instruction to the jury to consider each defendant individually in its deliberation." In addition to reaffirming its earlier ruling that "any statements made by McKee to Maynard constitute[d] inadmissible hearsay," the court also held "that the reporter's privilege under the First Amendment preclude[d] the introduction of the statements made to Michael Maynard."

McKee sought a judgment of acquittal or, alternatively, a new trial, arguing, *inter alia,* insufficient evidence of a conspiracy, and that hearsay evidence was improperly admitted. The district court denied the motion, holding that "the Government introduced substantial circumstantial evidence which allowed the jury legitimately to make reasonable inferences concerning defendant's association with his co-conspirator." In rejecting the hearsay allegations, the court reviewed Officer Brouwer's testimony regarding prior information and concluded that it "was not introduced for its truth value but to refute statements made on cross-examination by defendant Har-

wood's counsel which suggested that the agent had no information linking Harwood to any drug activity."

The district court sentenced McKee to the mandatory minimum of 20 years, to be followed by ten years' supervised release, because the offense involved more than 10 grams of LSD and he had a prior felony drug conviction in California. Harwood was sentenced to 188 months, to be followed by a five-year term of supervised release.

## DISCUSSION

### I. *Severance Motions*

■ McKee and Harwood contend that the district court erred in denying their motions for severance because their defenses were "irreconcilable" and "mutually antagonistic." In light of the Supreme Court's recent decision in *Zafiro v. United States,* —— U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), we reject this argument.

In *Zafiro,* the Supreme Court declined "to adopt a bright-line rule, mandating severance whenever codefendants have conflicting defenses," holding rather that "[m]utually antagonistic defenses are not prejudicial *per se.*" —— U.S. at ——, 113 S.Ct. at 937–38. In reaching this conclusion, the Court noted that "a district court should grant a severance ... *only if* there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at ——, 113 S.Ct. at 938 (emphasis added). In short, defendants must, at the threshold, articulate specific instances of "legally cognizable prejudice." *Id.* at ——, 113 S.Ct. at 939. Even then, severance is not required. *Id.* Rather, "[t]he decision whether to sever multi-defendant trials is committed to the sound discretion of the trial court and is 'virtually unreviewable.'" *United States v. LaSanta,* 978 F.2d 1300, 1306 (2d Cir.1992) (quoting *United States v. Cardascia,* 951 F.2d 474, 482 (2d Cir.1991)); *see Zafiro,* —— U.S. at ——, 113 S.Ct. at 938.

In this case, both defendants claim that they knew nothing about the LSD hidden in the van. Each accuses the other of placing it

there. Like the petitioners in *Zafiro,* both defendants argue that, because the jury was forced to evaluate mutually exclusive defenses, it was virtually inevitable that the jury would conclude that both were lying and would convict both on that basis. We find the argument unpersuasive.

McKee and Harwood have failed to satisfy the burden of showing "legally cognizable prejudice." *Id.* at ——, 113 S.Ct. at 939. Moreover, even if there were some risk of prejudice, the district court carefully instructed the jury that "guilt is individual, and your verdict of guilty or not guilty must be based solely upon the evidence about each defendant ... without regard to the guilt or innocence of anyone else." *See Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987) (proper limiting instructions often suffice to cure risk of prejudice).

Accordingly, we conclude that the district court did not abuse its discretion in denying defendants' motions to sever.

## II. *Suppression Motions*

Harwood contends that the district court should have granted his motion to suppress the product of the search because the search was based on his consent and his consent, in turn, was the fruit of an illegal arrest. While Harwood may well be right that he was arrested without probable cause when his van was stopped, and that his post-arrest consent to the search was tainted, the search did not depend for its validity upon his consent. The search was justified by the existence of independent probable cause to believe that the van contained contraband. Both defendants vigorously argue that there was no such probable cause. Specifically, they contend that the police had only "particularized" probable cause to search the person of McKee and his property. We reject these arguments.

■ A warrantless search of a movable vehicle is permissible when the police have probable cause to believe that the vehicle contains contraband. *Carroll v. United States,* 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925); *see also California v.* *Acevedo,* —— U.S. ——, ——, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991); *United States v. Ross,* 456 U.S. 798, 808–09, 102 S.Ct. 2157, 2164–65, 72 L.Ed.2d 572 (1982); *Chambers v. Maroney,* 399 U.S. 42, 51–52, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419 (1970). If the probable cause extends to the entire vehicle, the agent may conduct a warrantless search "of every part of the vehicle and its contents [including all containers and packages] that may conceal the object of the search." *Ross,* 456 U.S. at 825, 102 S.Ct. at 2172; *see also Acevedo,* —— U.S. at ——, 111 S.Ct. at 1986, 1991.

■ The quest for probable cause requires "a practical, common-sense decision, whether given all the circumstances ... there is a fair probability that contraband ... will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). "[O]nly a probability or substantial chance of criminal activity, not an actual showing of such activity" is necessary. *Id.,* 462 U.S. at 243 n. 13, 103 S.Ct. at 2334 n. 13. We conclude that the agents had probable cause to believe that Harwood's van contained contraband, that the warrantless search was permissible, and, therefore, that the evidence discovered in the van was admissible against both McKee and Harwood.

Undercover Deputy Marshal Labier had learned from two confidential sources that McKee and "his people" were the "sole supplier of critter LSD for the whole camp," and that McKee had "thousands of [LSD] hits" on him and was "knee deep in sheets of critter acid." When Labier tried to buy some LSD from McKee, McKee responded that "I got as much as you want.... [But] I don't have it on me.... [I]t's in the van. My friend's loading up the van now." Although no agent saw McKee retrieve the LSD he brought to Labier, uniformed agents discovered him and Harwood, shortly after the sale, packing Harwood's van. Officer Brouwer further testified that he had concluded from a 15–minute conversation with them that McKee and Harwood were friends. These facts, evaluated in the context of all the circumstances known to the investigating agents, were sufficient to support a finding

that LSD was probably hidden somewhere in Harwood's van.

It is true that Harwood's van was searched at the police command post several hours after it was seized. We reject the argument that this rendered the search illegal. When probable cause justifies the warrantless search of a lawfully stopped vehicle, the justification " 'does not vanish once the car has been immobilized.' " *United States v. Johns,* 469 U.S. 478, 484, 105 S.Ct. 881, 885, 83 L.Ed.2d 890 (1985) (quoting *Michigan v. Thomas,* 458 U.S. 259, 261, 102 S.Ct. 3079, 3080, 73 L.Ed.2d 750 (1982) (per curiam)). "There is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure." *Johns,* 469 U.S. at 487, 105 S.Ct. at 887 (three-day delay legal); *see also Chambers,* 399 U.S. at 52, 90 S.Ct. at 1981 (officers with probable cause to search automobile where it was stopped could legally do so later at the station house without first obtaining a warrant). Faced with a hostile crowd at the arrest scene, the delay in searching the van was eminently reasonable.

Finally, we do not believe that the search here was too broad. " 'The scope of a warrantless search of an automobile ... is defined by the object of the search and the places in which there is probable cause to believe that it may be found.' " *Acevedo,* —— U.S. at ——, 111 S.Ct. at 1991 (quoting *Ross,* 456 U.S. at 824, 102 S.Ct. at 2172). Because LSD in blotter form may be stashed anywhere in a vehicle, the search of the van's door panels was permissible. *Cf. United States v. Tobin,* 923 F.2d 1506, 1513 (11th Cir.) (agent's sighting of screws removed from station wagon's wheel well cover "clearly gave rise to probable cause to believe the wheel well contained contraband"), *cert. denied,* —— U.S. ——, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991).

Accordingly, we hold that the warrantless search of Harwood's van was lawful under the Fourth Amendment.

III. *The Maynard Subpoena*

Harwood asserts that the district court erred in quashing the subpoena served on reporter Maynard, contending that the prof-fered testimony was neither inadmissible hearsay nor protected by the reporter's First Amendment privilege. Because we agree with the district court that the testimony was inadmissible hearsay, we do not reach Harwood's First Amendment argument.

Maynard would have testified that McKee, approximately three weeks before trial, stated that "Harwood was in the wrong place at the wrong time," and "the same would have happened to any person driving a vehicle in which he [McKee] was a passenger." Harwood claims that these statements were nonhearsay because they were offered: (1) solely for the fact that they were made and not for their truth; and (2) as evidence of the declarant's state of mind and pattern of verbal behavior. He also maintains that the statements were admissible under Fed.R.Evid. 801(d)(2)(A), which excludes from hearsay "admission[s] by [a] party-opponent" in the form of "the party's own statement[s]." None of these contentions is defensible.

Statements may occasionally be offered, not to prove their truth, but solely for the limited purpose of proving that they were made. They may be admitted, however, only if the mere fact that they were made is relevant to some issue in the case. *United States v. Cardascia,* 951 F.2d 474, 486–87 (2d Cir.1991). Here the fact that McKee made the statement to Maynard is irrelevant. What would be relevant is that Harwood was in truth in the wrong place at the wrong time—not that McKee thought so. Hence the statement is irrelevant unless it was true, in which case it would be hearsay, and inadmissible under any of the exceptions in Fed. R.Evid. 803 and 804. Similarly, the declarant's state of mind and "pattern of verbal behavior" were irrelevant to any issue in the case and cannot be invoked like a mantra to circumvent a hearsay objection.

We reject Harwood's argument that McKee's statements were admissions by a party opponent "because the admission sought to be introduced was made by a co-defendant who is not a party opponent. The Government is the party opponent of both defendants." *United States v. Gossett,* 877 F.2d 901, 906 (11th Cir.1989), *cert. denied,*

493 U.S. 1082, 110 S.Ct. 1141, 107 L.Ed.2d 1045 (1990).

 Harwood's attempt to invoke Fed. R.Evid. 803(3) is also unavailing. That rule admits

[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition ... but not including a statement of memory or belief to prove the fact remembered or believed....

Fed.R.Evid. 803(3). Thus, the statement must face forward, rather than backward. *See United States v. DiMaria*, 727 F.2d 265, 271 (2d Cir.1984) (quoting *Shepard v. United States*, 290 U.S. 96, 104, 54 S.Ct. 22, 25, 78 L.Ed. 196 (1933) (Cardozo, J.)). In addition, "the reasons for the state of mind exception focus on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation." *Cardascia*, 951 F.2d at 487. McKee's statements were not offered to prove his state of mind, but were intended to be used by the jury to support an inference about conduct that had occurred five months earlier. To admit such statements "would significantly erode the intended breadth of this hearsay exception." *Cardascia*, 951 F.2d at 488.

 Harwood's next argument that McKee's statements were admissible under Fed.R.Evid. 804(b)(3) as a declaration against penal interest is likewise without merit. *See United States v. DeVillio*, 983 F.2d 1185, 1189 (2d Cir.1993) ("Appellate review of this issue is limited to an 'abuse of discretion' standard.") Rule 804(b)(3) has three requirements: (1) an "unavailable" declarant; (2) the statement, at the time it was made, was against the declarant's penal interest; and, (3) when offered to exculpate Harwood, corroborating circumstances clearly indicating trustworthiness. *United States v. Rodriguez*, 706 F.2d 31, 40 (2d Cir.1983). Here, the government conceded that McKee would have been "unavailable," under Fed. R.Evid. 804(a)(1), but Harwood fails to satisfy the other two requirements.

The proffered statements, on their face, do not expose McKee to criminal liability. They seem only to suggest that Harwood was arrested at an inopportune time. In any event, we have rejected similar efforts by one defendant to shift blame away from another with purported declarations against the former's penal interest. *See, e.g., United States v. Wilkinson*, 754 F.2d 1427, 1436 (2d Cir.) (affirming district court refusal to allow a private investigator to testify about a statement made by defendant–1 that defendant–2 did not know that defendant–1 was selling drugs out of defendant–2's store), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

Even if McKee's statements had unequivocally placed blame on himself alone, these statements still failed to meet the trustworthiness requirement. "The inference of trustworthiness from the proffered 'corroborating circumstances' *must be strong*, not merely allowable." *United States v. Salvador*, 820 F.2d 558, 561 (2d Cir.) (emphasis added), *cert. denied*, 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 398 (1987). Here, there is no corroborating evidence that McKee's statements about Harwood's innocence were trustworthy.

 Harwood's final argument based on the residual hearsay exception, Fed.R.Evid. 803(24), is also rejected. To be admissible under this exception, "the evidence must fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice." *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir.1991) (citations omitted). Rule 803(24) is "applied in the rarest of cases, and the denial of admission under the exception[ ] can only be reversed for an abuse of discretion." *DeVillio*, 983 F.2d at 1190. Here, the district court found McKee's statements to be "untrustworthy and highly prejudicial." In light of the availability of other evidence, especially other inculpatory statements made by McKee, we cannot say that the court committed error in refusing to admit McKee's statement under Rule 803(24). *See Cardascia*, 951 F.2d at 489.

In sum, the district court properly quashed the subpoena served on Maynard. His proffered testimony was hearsay, and inadmissible under any exception.

IV. *Admissibility of "Intelligence" Evidence*

McKee argues that the district court erroneously admitted hearsay when it permitted government agents Labier and Brouwer to testify, over objection, that through their "intelligence" they knew that McKee was the "main supplier" of LSD at the Rainbow Family gathering. Because he distributed only $20 worth of LSD and the issue at trial was whether he was involved with the large stash of LSD discovered in the van, McKee contends that admission of this testimony was reversible error. *See, e.g., United States v. Tussa*, 816 F.2d 58, 66–67 (2d Cir.1987) (erroneous admission of hearsay information from uncalled informants requires reversal if it "had substantial and injurious effect or influence in determining the jury's verdict").

■ The government's argument that this "intelligence" testimony was not hearsay and was properly admitted as background is familiar but unpersuasive in this case. "When statements by an out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed." *United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir.1984) (citations omitted); *see also United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir.1991) (" '[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.' ") (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988)), *cert. denied*, ─── U.S. ───, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992).

The government maintains that the evidence was not elicited to prove McKee was the "main supplier," but merely to explain why Deputy Marshal Labier originally approached McKee at the gathering. Here, however, McKee conceded (in his opening statement) that he had sold $20 worth of LSD to Labier. Why Labier approached McKee, therefore, was irrelevant. Even if there were some need to explain Labier's reason for approaching McKee, the government had already established that Aaron Cantor, a Rainbow Family member whom agents had arrested for drug possession, had informed on McKee. What the so-called "intelligence" testimony really added to the government's case was proof that McKee was the "main supplier" of LSD. It was clearly inadmissible hearsay.

■ While it was error to admit the "intelligence" testimony, we conclude that the error was harmless in light of the record as a whole. Fed.R.Crim.P. 52(a) (error harmless if it "does not affect substantial rights"); *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946) (in nonconstitutional cases, inquiry is whether, viewing the record as a whole, error had substantial and injurious effect in determining jury's verdict); *cf. United States v. Check*, 582 F.2d 668, 685 (2d Cir.1978) (court reviewed erroneous introduction of undercover agent's testimony about confidential informant's out-of-court statements under *Kotteakos* test). *Compare Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (higher standard for federal constitutional error).

The mass of admissible evidence connecting McKee to the LSD in Harwood's van was overwhelming. *See* 3A Charles A. Wright, *Federal Practice & Procedure* § 854, at 311 (2d ed. 1982) ("Error in the admission of evidence is harmless if the facts shown by that evidence are already before the jury through other properly-admitted evidence."). All the LSD seized in this case was identical in every respect except weight, thus supporting the inference that the LSD originated from the same source. While negotiating a drug sale with Labier, McKee boasted that he had as much LSD as Labier wanted and, significantly, that he had to return to a friend's vehicle to retrieve it. Later conversations between the defendants and Brouwer further demonstrated a close relationship between McKee and Harwood. Fingerprint analysis also established that both defendants had handled express mail envelopes found inside the van, discrediting any argument that they had gotten together only on

that day for the sole purpose of making the trip to the West Coast. Where there is overwhelming evidence of guilt, as there was here, it is " 'highly probable' that the error did not contribute to the verdict." *United States v. Corey,* 566 F.2d 429, 432 (2d Cir. 1977) (citations omitted).

### V. *The Pinkerton Charge*

■■■ Harwood contends that he was prejudiced by a *Pinkerton* charge, *Pinkerton v. United States,* 328 U.S. 640, 645, 66 S.Ct. 1180, 1183, 90 L.Ed. 1489 (1946), "which permits a jury to find a defendant guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy." *United States v. Miley,* 513 F.2d 1191, 1208 (2d Cir.) (Friendly, J.), *cert. denied,* 423 U.S. 842, 96 S.Ct. 75, 46 L.Ed.2d 62 (1975). Harwood argues that there was insufficient evidence to establish the existence of a requisite conspiracy before the jury could consider the substantive offense, and that the *Pinkerton* charge on the substantive count improperly influenced the jury's verdict on the conspiracy count itself, so tainting it as to require reversal of both convictions. *See United States v. Cantone,* 426 F.2d 902, 904–05 (2d Cir.) (where evidence was insufficient to establish existence of a conspiracy, "the giving of the *Pinkerton* charge undoubtedly influenced the jury's finding" with respect to conspiracy charge), *cert. denied,* 400 U.S. 827, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970); *see also United States v. Sperling,* 506 F.2d 1323, 1341 (2d Cir.1974) (noting that the *Pinkerton* charge "should not be given as a matter of course"), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975).

In his charge on the substantive counts, the trial judge, over objection, instructed the jury: "If, in light of my instructions, you find

beyond a reasonable doubt that each of the defendants was a member of the conspiracy charged in Count 1 of the indictment and, thus, guilty on the conspiracy count, then you may also, but you are not required to, find him guilty of the substantive crimes charged in Counts 2 and 3 . . . ." The court then meticulously discussed the five elements that the government had to prove beyond a reasonable doubt to warrant a finding of guilt under *Pinkerton.*

As discussed in section IV, *supra,* there was ample evidence independent of the substantive possession crime from which the jury could find beyond a reasonable doubt that Harwood and McKee conspired together. This is not a case "where the evidence is such that the jury is required to resort to the inverse of *Pinkerton* and infer the existence of a conspiracy" from a substantive offense. *United States v. Corr,* 543 F.2d 1042, 1050 (2d Cir.1976); *see Sperling,* 506 F.2d at 1342. Further, the trial judge properly instructed the jury to consider the substantive count only after it first found that a conspiracy existed between the defendants. *See United States v. Gleason,* 616 F.2d 2, 19 (2d Cir. 1979), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980). Considering the charge as a whole, *see United States v. Torres,* 901 F.2d 205, 240 (2d Cir.) (quoting *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973) (citation omitted)) ("a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge"), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990), we find no reversible error here.

### VI. *McKee's Sentencing*

■■■ McKee received an enhanced sentence as a second offender under 21 U.S.C. § 841(b)(1)(A) (1988 & Supp. III 1991). On appeal, McKee argues that the trial judge failed to follow 21 U.S.C. § 851(b),[1] which

---

1. Section 851(b) provides, in pertinent part:
 If the United States attorney files an information under [§ 851], the court shall after conviction but before pronouncement of sentence inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously

convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence.
21 U.S.C. § 851(b) (1988).

requires that the defendant, and not his attorney, affirm or deny the prior conviction alleged in the government's information. We do not read the statute so narrowly.

Prior to trial, the government filed an information with the district court, as required by 21 U.S.C. § 851(a)(1), identifying McKee's felony drug conviction in California as the prior conviction upon which the court was to rely in order to enhance his sentence. Thus, McKee had sufficient notice of the district court's intent to use his prior conviction, failed to raise any objection to its use, and when asked at the sentencing hearing, told the court through counsel that he did not dispute the conviction. "That is all the statute requires." *United States v. Harris,* 592 F.2d 1058, 1061 (9th Cir.1979) (discussing 26 U.S.C. § 7237(c)(2), predecessor to 21 U.S.C. § 851(b)); *see United States v. Garcia,* 954 F.2d 273, 276–77 (5th Cir.1992). *But see United States v. Jordan,* 810 F.2d 262, 269 (D.C.Cir.) ("District Court's failure to ask appellant personally whether he affirms or denies the previous conviction" requires remand for resentencing) (citing *United States v. Ramsey,* 655 F.2d 398, 400 n. 7 (D.C.Cir. 1981) (§ 851(b) requires strict, not substantial, compliance)), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1963, 95 L.Ed.2d 535 (1987); *see also United States v. Garrett,* 565 F.2d 1065, 1072 (9th Cir.1977), *cert. denied,* 435 U.S. 974, 98 S.Ct. 1620, 56 L.Ed.2d 67 (1978); *United States v. Cevallos,* 538 F.2d 1122, 1126–27 (5th Cir.1976); *United States v. Garcia,* 526 F.2d 958, 961 (5th Cir.1976).

Accordingly, we conclude that the trial judge's sentencing ritual here complied with the requirements of § 851(b).

## CONCLUSION

We have considered defendants' other arguments and find them to be without merit. The judgment of the district court is therefore affirmed.