COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judge Friedman and Senior Judge Clements
Argued at Richmond, Virginia

PUBLISHED

AVONTAE MAURICE SMITH

v.     Record No. 0949-24-2

OPINION BY
JUDGE FRANK K. FRIEDMAN
JULY 29, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Jayne A. Pemberton, Judge

Gregory R. Sheldon (Bain Sheldon, PLC, on brief), for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of Chesterfield County convicted Avontae

Maurice Smith of second-degree murder. A key witness against Smith was his brother, and co-

defendant, Asunte Barksdale. On appeal, Smith contends that the circuit court erred in finding

Barksdale[1] was not a party to the proceedings and thus erred in denying Smith's motion *in limine*

seeking to admit Barksdale's prior statements as adoptive admissions to the crime. Smith also

asserts that the circuit court erred in finding the evidence sufficient to support his conviction.

For the following reasons, we affirm.

---

[1] Barksdale's case was severed from Smith's and proceeded separately.

BACKGROUND[2]

Events leading to Smith's arrest

At around 3:30 a.m. on October 31, 2022, Chesterfield County Police Officer Addison Guthrie responded to a shooting incident in the 1400 block of North Carriage Lane in Chesterfield County. Upon his arrival, Officer Guthrie observed an individual later identified as Robert Ashburn lying in the street suffering from a gunshot wound to the chest. Officer Guthrie applied a halo chest seal[3] and began CPR. He continued to apply chest compressions for three or four minutes before an EMT took over. Officer Guthrie then canvassed the area for security camera footage that might have captured the shooting but failed to locate any video capturing a suspect vehicle or person.

Master Police Officer Patrick Howard also responded to the shooting incident. Officer Howard eventually located a surveillance camera at Ashburn's home overlooking the driveway. The video footage showed Ashburn exiting his house at 3:20 a.m. while someone was rummaging through one of the cars in his driveway. Ashburn confronted the individual, and there was a brief exchange of words. The camera footage did not capture the shooting itself, but audio recorded a male voice yelling at Ashburn to "stop, Bro, stop" and then a loud shot.

Chesterfield County Forensic Investigator Lorrie Cecchini processed the crime scene. Investigator Cecchini observed Ashburn's body lying in the driveway, covered by a white sheet, and she found a 9 mm Luger Blazer cartridge case lying nearby in the roadway. Investigator Cecchini swabbed the vehicles in Ashburn's driveway for fingerprints and lifted six latent prints

---

[2] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).

[3] Officer Guthrie testified that a halo chest seal is used for two reasons: "it primarily prevents air from entering the wound" but it is also useful "to limit external air loss."

for comparison.  She also collected elimination prints from the registered owners of the cars.  Investigator Cecchini submitted the latent prints to the police department for analysis.

Latent Fingerprint Examiner Sandy Simmons examined the fingerprints Investigator Cecchini collected at the crime scene.  Simmons ran them through AFIS[4] for identification.  Four of the prints came back to known parties: two registered vehicle owners, another person from the neighborhood, and Ashburn.  Two of the fingerprints were not identified.  AFIS did not match any of the fingerprints put into the database with Smith, and Simmons was also not provided a known fingerprint sample for comparison.

Chesterfield County Police Detective Kyle Kirby testified as an expert in cellular device analytics and tracking.  Detective Kirby prepared a series of search warrants for various cellphone companies seeking information on devices that may have been in the area at the time of the shooting.  Detective Kirby identified "one particular device" that was in the incident location—"essentially in that driveway"—at the time of the shooting.  The device was an iPhone X410.  Detective Kirby obtained a search warrant for the phone and sent it to Apple.  He testified that Apple returned information pertaining to "subscriber data, previous historical, address data, and just other identifying characteristics and a name."  Detective Kirby also obtained "further specialized" information about the iPhone from T-Mobile.  That information included an address for the phone's owner, whom he identified as Barksdale.  Detective Kirby's analysis of the data indicated that, at the time of the shooting, the phone was likely in Ashburn's driveway—or, at the very least, within 215 feet of his house.  After the shooting, the iPhone traveled south and was in the vicinity of a nearby YMCA before turning around and moving on Midlothian

---

[4] AFIS is an acronym that stands for Automated Fingerprint Identification System, which is a database of known and unknown fingerprints used to search fingerprint samples for a match. Simmons explained at trial that after fingerprints lifted at a crime scene are plotted for sufficient information and detail, AFIS will conduct a search for similar prints that are already in the system.

Turnpike toward the city of Richmond. At one point, the iPhone was stagnant at a 7-Eleven on Turner Road just a few miles from the crime scene.

Chesterfield Police Officer Caitlin Shepherd was on patrol on Midlothian Turnpike between 3:30 and 4:00 a.m. on October 31, when she conducted a traffic stop on a black SUV because its taillights were off. The SUV was about seven miles from the crime scene. Smith was driving the vehicle, and two other males were in the car, one sitting in the front passenger seat later identified as Barksdale, and one sitting in the back seat, later identified as Michael Faison. Officer Shepherd noticed that Smith was dressed all in black and that a thin ski mask hung from his neck. Although she was aware of the death investigation taking place on North Carriage Lane, she had no reason to suspect Smith and released him on a summons.

Chesterfield County Police Detective Christopher Guice also investigated the shooting. After identifying Barksdale as a suspect in the murder, Detective Guice learned that Barksdale's brother had a vehicle that had "no taillight or the taillights were not working." Detective Guice consulted a Flock[5] hit from a license plate reader and found that Smith's license plate was captured on Walmsley Boulevard eight to ten miles from the crime scene at 2:13 a.m. on October 31. Detective Guice then went to the 7-Eleven on Turner Road and viewed video surveillance from that location. Store cameras captured a black SUV with no taillights driving by at some point after the shooting and Barksdale walking into the store.

Barksdale was arrested on November 18, 2022. Initially, Barksdale denied any involvement in the shooting and told numerous lies. He later admitted he was at the crime scene. During the interview, the following relevant exchanges took place:

> **Detective Guice**: I don't know, that guy, I'm listening to you right now, and the guy on that video sounds a lot like you.

---

[5] A Flock camera system is an automated license plate reader that photographs the license plates of passing vehicles.

**Detective Warejko**:  Uh huh.  Bro, stop bro.  Bro, stop.

**Barksdale**: Tell me the truth.

**Detective Guice**:  He does.  He does.

**Barksdale**: It sounds bad.

**Detective Guice**: Huh?

**Barksdale**: You make it sound bad.

. . .

**Detective Warejko**: Now, he obviously approaches you and is like, hey man, what's going on, what are you doing bro. Obviously, you are caught off-guard because it is dark as shit out there.  It is super dark out there.  And you probably didn't see him coming up on you because that driveway was so dark.  They didn't have any outside lights on.  And you panicked because you didn't know who was coming at you.  You are out there by yourself.  You don't know who's coming at you.  And a shot rings off.  Probably meant to scare him.  Maybe a warning shot, you know.  And then you book out of there because you panicked.  It's not like you went up to the man and just unloaded on him or as he came up to you, you unloaded on him, you know.

**Barksdale**: Yeah.

**Detective Warejko**:  That would catch me off-guard too man.  If I'm out there by myself and someone walks out because like you said there is a lot of trees there with leaves and everything.  You would hear that rustling of the leaves.  You know, you go through the car, maybe you are done with that driveway, you are walking away and all of a sudden you hear someone coming up on you.  I mean, that's why you are telling him to stop, you're like, I mean if you really can't see all that well, you yell stop, stop bro.  Stop, bro, stop.  Pulled out your gun, like I said, it could have been a warning shot, you know, you may not even meant to hit him.

**Barksdale**:  Bro, I didn't.  It's bad.  It's fucked up, bro.  I'm going to be hurting.

. . .

**Detective Warejko**:  Look man, in the audio of the video you can hear you saying stop, bro, stop like you're trying to like de-escalate it.  Like you are trying to get him to back up because you don't want to hurt anybody.  But like you said, he just came up on you.  You're saying bro stop, stop bro.  You don't know who's coming

- 5 -

up on you.  Bro, stop.  Stop, bro.  Bro, stop.  So, to me that sounds like you are trying to kind of de-escalate the situation and kind of smooth things out and kind of get out of there.  But he's probably still walking towards you because he doesn't know who is in his driveway.  He sees that his girlfriend's car light is on in her car.  So, yeah, that's his house, he's gonna go walk out and see like hey who is in my yard and catches you off-guard.  And then you panicked.

**Barksdale**:  What time is it?

Although Barksdale eventually admitted he was at the crime scene, he told detectives that Smith was the shooter.

The police took Smith into custody on November 28, 2022.  On November 29, they advised Smith of his *Miranda*[6] rights, and Smith agreed to speak with Detectives Guice and Warejko.  Smith admitted that he was stopped for a traffic offense on the morning of October 31, but he denied being at the crime scene or having anything to do with the shooting.  He also insisted that Barksdale and Faison were not in the car with him when he was stopped despite repeated assertions from detectives that they were all three captured on Officer Shepherd's bodycam.

Smith's trial

Before trial, Smith filed a motion *in limine* seeking to introduce Barksdale's answers to Detectives Warejko and Guice as adoptive admissions, which he argued is "a recognized exception to the hearsay rule."  The Commonwealth objected and disputed that Barksdale was a party opponent to the proceedings as required by the exception.  The circuit court heard argument on Smith's motion before trial and ultimately concluded that Barksdale's statements were not party admissions.  Accordingly, the circuit court denied Smith's motion *in limine*.

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Barksdale testified at trial. Barksdale explained that he was at home in the early morning hours of October 31 when at some point he met up with Smith and Faison. Together they entered Smith's car and aimlessly drove around. Barksdale did not initially notice that Smith had a gun. When they stopped at a gas station, Barksdale noted that Smith carried a 9 mm G Series weapon. Barksdale recalled that Smith eventually parked his car on the side of a dark road in a residential neighborhood. Smith and Faison had an argument over something that "made no sense at all," to Barksdale before Smith said, "I'm not your bitch," exited the car, and claimed he would be back. Barksdale and Faison remained in the car.

Barksdale testified that five or ten minutes later, he exited the car to urinate and heard an argument or yelling "off in a distance." He could not see where the argument was coming from, but upon hearing a gunshot Barksdale "jumped back in the car." Two minutes later, Smith ran back to the car, "jumped in," and they drove away. Barksdale testified that Smith was wearing black clothes, a black mask, and gloves. He did not see the gun. Barksdale said that Faison never left the car. Barksdale testified that he recognized Smith's voice in the video surveillance from Ashburn's driveway at the time of the murder. He also said that on the way back to his house, they got pulled over by police.

On cross-examination, Smith played Barksdale a series of video clips to refresh his recollection about statements he made to police.[7] After reviewing the video clips, Barksdale admitted that some of his answers on cross-examination were different from some of the answers he gave to police during his interview. Barksdale admitted to the following: that on two occasions he said, "I F-ed up, Bro," that he shook his head "side to side" when detectives asked if Ashburn came after him or tried to grab him, that he told detectives he wanted to know how he

_____

[7] The video clips were played without the jury present in the courtroom. The jury was subsequently brought back into the courtroom to hear the remainder of Barksdale's testimony.

might profit from speaking to them, that he did not answer when detectives said he and Ashburn were the only two people who can explain what happened, that he initially denied Smith was with him on the night of the offense, and that he did not tell detectives that Smith sounds like him. On re-direct examination, the following exchange occurred between Barksdale and the Commonwealth with respect to the purported "adoptive admissions" he made to Detectives Guice and Warejko:

> **The Commonwealth**: And then [defense counsel] asked you, you said "Bro, I didn't." What did you mean by, "Bro, I didn't?"
>
> **Barksdale**: I didn't do it. Bro, I didn't do it. This is what I cannot do. I cannot do this. I did not do it.
>
> **The Commonwealth**: Who did?
>
> **Barksdale**: Mr. Smith did.
>
> **The Commonwealth**: When you said it's bad, what was bad?
>
> **Barksdale**: The situation is bad because I'm tied into this.
>
> **The Commonwealth**: Why were you going to be hurting?
>
> **Barksdale**: Because I'm going to have to sit in jail behind my brother. I'm going to have to sit in jail trying to take care of my younger brother. My mother expected me to look out for him. I did the best I could. I could not see my brother sleeping out on the back porch no more so I tried to give him time and space to get his life together. I tried. From young I tried to calm him down, show him different ways, and he just couldn't do it. He just couldn't do it.

Assistant Chief Medical Examiner Jennifer Bowers performed Ashburn's autopsy and testified as an expert in forensic pathology. Dr. Bowers opined that Ashburn died of a single gunshot wound to the chest. The bullet entered the chest cavity through the right 6th rib, struck the top and bottom of Ashburn's heart, travelled through the right lung, grazed the 12th thoracic vertebra and exited through Ashburn's back. There was no visual evidence of soot or stippling to suggest that the bullet was fired at close range.

Chesterfield County Police Detective David Clayton testified as an expert in mobile device forensics. Detective Clayton was given a Samsung Galaxy S9 that belonged to Smith. Smith's phone was used at 7:10 a.m., 7:11 a.m., and 7:12 a.m. on October 31, 2022, to conduct google searches for a "Richmond shooting," a "Virginia shooting" or a "Chesterfield shooting." At 7:27 a.m., the phone was used to consult "CBS6 News Richmond." At 7:32 a.m., Smith's phone was used to read a press release from the Chesterfield County Police Department regarding the "homicide investigation [that was] underway on North Carriage Lane in Midlothian." The phone also captured subsequent searches specifically for "North Carriage Lane Midlo shooting," "Midlo Homicide," "Midlo Homicide today" and "Richmond homicide." Additional Google searches related to the murder and Barksdale's arrest were made on November 11, 19, 23, 24, and 25. On November 9, 2022, a Google search for "Avontae Smith arrested" was conducted. Also found during that search, according to Detective Clayton, was a picture of Smith posted by Smith on his Facebook page on "November 9, 2022 with the caption 'I know what I did. Come get the job done already.'"

After the Commonwealth rested, Smith moved to strike the evidence as insufficient to support a conviction for first-degree murder. He argued that the evidence failed to prove the elements of premeditation and deliberation for the offense. He also argued that Barksdale was not a credible witness because his testimony contained numerous inconsistencies, he expected leniency, he had a motive to fabricate, and there was a lack of physical evidence proving Smith's involvement. Smith argued that Barksdale's testimony was "well beyond contradictions and well beyond inconsistencies" to such an extent that it was "incredible as a matter of law." The circuit court denied the motion to strike. Smith then presented evidence and renewed his motion to strike. The circuit court denied his renewed motion to strike, and the jury convicted Smith of

second-degree murder.  The circuit court sentenced Smith to 40 years in prison with 19 years suspended.  Smith now appeals.

ANALYSIS

I.  The circuit court did not err in denying Smith's motion *in limine*.

"The admissibility of evidence is within the broad discretion of the trial court."  *Cheripka v. Commonwealth*, 78 Va. App. 480, 494 (2023) (quoting *Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020)).  "[W]e review a trial court's decision to admit or exclude evidence using an abuse of discretion standard and, on appeal, will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion."  *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021) (alteration in original) (quoting *Avent v. Commonwealth*, 279 Va. 175, 197 (2010)).  "The abuse of discretion standard draws a line—or rather, demarcates a region— between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)).[8]  However, as a question of law, the circuit court's interpretation of Virginia Rule of Evidence 2:803(0)(B) "requires de novo review."  *McBride v. Commonwealth*, 75 Va. App. 556, 569 (2022) (citing *Brown v. Commonwealth*, 279 Va. 210, 217 (2010)).

---

[8] "In evaluating whether a trial court abused its discretion, . . . we do not substitute our judgment for that of the trial court.  Rather, we consider only whether the record fairly supports the trial court's action."  *Kenner*, 299 Va. at 423 (alteration in original) (quoting *Carter v. Commonwealth*, 293 Va. 537, 543 (2017)).  In other words, "[t]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance."  *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (second alteration in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).

Smith argues the circuit court abused its discretion by denying his motion *in limine* asking that Barksdale's statements to Detectives Guice and Warejko be admitted as adoptive admissions to the shooting. We disagree. As found by the circuit court, Barksdale was not a party-opponent to the case.

"Hearsay is inadmissible unless permitted by an exception, and the party offering the evidence must 'clearly show' that the exception applies." *Khine v. Commonwealth*, 75 Va. App. 435, 444-45 (2022) (quoting *Clay v. Commonwealth*, 33 Va. App. 96, 104 (2000) (en banc), *aff'd*, 262 Va. 253 (2001)); *see also* Va. R. Evid. 2:802 ("Hearsay is not admissible except as provided by these Rules, other Rules of the Supreme Court of Virginia, or by Virginia statutes or case law."). One such exception to the general rule against hearsay allows for an "admission by [a] party-opponent" and includes "a statement offered against a party" who "has manifested adoption or belief in its truth." Va. R. Evid. 2:803(0)(B). Indeed, when a statement against the accused relating to "the commission of an offense is made in his presence and hearing and is not denied or contradicted by him, both the statement and the fact of his failure to deny are admissible" at trial. *Lynch v. Commonwealth*, 272 Va. 204, 208 (2006) (quoting *Knight v. Commonwealth*, 196 Va. 433, 436 (1954)). The admissibility of these adoptive admissions "as evidence of [the accused's] acquiescence in [their] truth, is based on the theory that the natural reaction of one accused of a crime is to deny the accusation if it is unjust or untrue." *Id.* (quoting *Knight*, 196 Va. at 436); *see also Welch v. Commonwealth*, 271 Va. 558, 564-65 (2006) (embracing the principle in a non-hearsay context).

"A statement may become admissible under the adoptive admission exception to the hearsay rule upon a showing of its tacit adoption by a party, as well as by more overt demonstrations of adoption." *Lynch*, 272 Va. at 209. "A party may manifest adoption of a statement made by another in any number of ways, including words, conduct, or silence." *Id.*

- 11 -

However, "[a] party relying upon an exception to the hearsay rule for the admissibility of evidence bears the burden of persuading the court that the evidence falls within the exception." *Id.* at 207-08. "Factual questions must usually be resolved to determine whether the proponent of the evidence has carried that burden, and those antecedent or predicate facts are to be determined by the trial court alone." *Id.* at 208.

The Supreme Court of Virginia, as Smith correctly notes, has defined "party" in the general sense of the word as "[o]ne by or against whom a lawsuit is brought," or "anyone who both is directly interested in a lawsuit *and* has a right to control the proceedings, make a defense, or appeal from an adverse judgment[,]" or one who is a "'litigant[;]' as in 'a party to the lawsuit.'" *Bonanno v. Quinn*, 299 Va. 722, 730 (2021) (first and third alterations in original) (quoting *Party*, *Black's Law Dictionary* (11th ed. 2019)). Smith reasons that because Barksdale was arrested for the same criminal investigation by the same detectives and was being prosecuted for the same homicide in the same court by the same prosecutors, coupled with the fact that the Commonwealth could have joined them as co-defendants under Rule 3A:10,[9] this Court should find that Barksdale was a party to Smith's case. Smith argues persuasively, but legal authority does not support his desired outcome.

While neither our Court nor the Supreme Court of Virginia has spoken on the exception in the context of co-defendants in criminal cases, other jurisdictions that have analyzed the question have determined that, in criminal cases with multiple co-defendants, the government is

---

[9] Rule 3A:10(a) provides:

> On motion of the Commonwealth, for good cause shown, the court should order persons charged with participating in contemporaneous and related acts or occurrences or in a series of acts or occurrences constituting an offense or offenses to be tried jointly unless such joint trial would constitute prejudice to a defendant.

the party-opponent of each co-defendant and that the co-defendants are not party-opponents to each other. *See Hagans v. United States*, 96 A.3d 1, 24 n.46 (D.C. 2014) ("Under traditional rules of hearsay, a defendant's extrajudicial statement, offered solely as the admission of a party opponent and not under any other hearsay exception, is inadmissible against a co-defendant."); *see also State v. Payne*, 104 A.3d 142, 159 (Md. 2014) (holding that for purposes of the hearsay rule the State was the party-opponent of both co-defendants and that neither co-defendant "was the party-opponent of the other"); *accord United States v. Gossett*, 877 F.2d 901, 906 (11th Cir. 1989) ("The testimony was not admissible under Rule 801(d)(2) because the admission sought to be introduced was made by a co-defendant who is not a party opponent. The Government is the party opponent of both defendants."); *United States v. Harwood*, 998 F.2d 91, 97-98 (2d Cir. 1993) (same); *see also Anderson v. State*, 861 S.E.2d 151, 164 (Ga. 2021) (finding that the state is the party opponent to the defendant and a co-defendant who pleaded guilty was not a party opponent of the accused (citing *United States v. Pacchioli*, 718 F.3d 1294 (11th Cir. 2013))); *People v. Jones*, Nos. 328816, 328901, 2017 Mich. App. LEXIS 213, at *34 (Feb. 9, 2017) ("Although codefendants are party opponents of the prosecution, they are not party opponents of one another."); *State v. Allen*, No. 08 CR I 04 0207 A&B, 2008 Ohio Misc. LEXIS 4683, at *2-3 (Ct. C.P. July 10, 2008) (finding that for purposes of the admissions by a party-opponent exception to the hearsay rule, "no co-defendant may solicit statements made by the other co-defendant" because they are not party opponents).

We apply that same reasoning here. We conclude that Barksdale was not a "party" to Smith's prosecution; in Smith's trial Barksdale was merely a witness. *See* Va. R. Evid. 2:607(b) (*Witness with adverse interest*.—A *witness* having an adverse interest may be examined with leading questions by the *party* calling the witness. After such an adverse direct examination, the *witness* is subject to cross-examination." (emphases added)). The Commonwealth was the party-

opponent of Smith, and the Commonwealth was also the party-opponent of Barksdale, in Barksdale's pending case. Barksdale and Smith are not party opponents to each other. Indeed, even if the two cases had been joined for trial, Barksdale would not have had standing to appeal Smith's conviction or any rulings made by the judge affecting Smith. Thus, the circuit court did not err in finding that Barksdale was not a party to the case.

In sum, we find no error in the circuit court's denial of Smith's motion *in limine* seeking to admit Barksdale's statements to Detectives Guice and Warejko as adoptive admissions to the crime. Barksdale was not a party-opponent to the case, and thus the exception did not apply to him.[10]

II. The evidence was sufficient to support Smith's conviction.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193

---

[10] Smith also argues on appeal that the circuit court erred when it determined Barksdale's statements were not adoptive admissions. The Commonwealth counters that the circuit court heard Barksdale's disputed statements and asserts that the circuit court reasonably could find the statements were not adoptive admissions at all. Because we conclude that the exception did not apply to Barksdale because he is not a party opponent, we need not reach whether Barksdale's statements were adoptive admissions because the exception does not apply. *See Commonwealth v. White*, 293 Va. 411, 419 (2017) ("[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015))).

(2009)).  "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'"  *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).  Additionally, when the sufficiency of the evidence is challenged on appeal, an appellate court "review[s] the evidence in the 'light most favorable' to the Commonwealth, the party prevailing in the trial court."  *Commonwealth v. Barney*, 302 Va. 84, 96 (2023) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)).

"Second-degree murder, of which the jury convicted appellant, is defined as a malicious killing."  *Diaz v. Commonwealth*, 80 Va. App. 286, 313 (2024) (quoting *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016)).  "In order for an act to be done maliciously, the act must be done 'wilfully or purposefully.'"  *Id.* (quoting *Woods*, 66 Va. App. at 131).  "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation."  *Woods*, 66 Va. App. at 131 (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992)).  Further, "[m]alice may be inferred 'from the deliberate use of a deadly weapon unless, from all the evidence,' there is reasonable doubt as to whether malice existed."  *Washington v. Commonwealth*, 75 Va. App. 606, 621 (2022) (quoting *Avent*, 279 Va. at 201-02).

On appeal, Smith does not dispute that a killing took place or that it was malicious.  He merely argues that the evidence failed to prove he was the actual shooter.

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt."  *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)).  As with any element of an offense, identity may be proved by direct or circumstantial evidence.  *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999).  "[C]ircumstantial evidence is competent and is

- 15 -

entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "This Court does not view circumstantial evidence in isolation." *Lucas v. Commonwealth*, 75 Va. App. 334, 346-47 (2022). However, the "combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." *Id.* at 347.

The evidence presented below was sufficient to prove to a jury that Smith was the perpetrator. Smith's vehicle was near Ashburn's neighborhood an hour before the shooting, and his car was in the vicinity of the shooting both before and after the crime occurred. Subsequently, Smith was stopped for a traffic violation no more than seven miles from the crime scene about ten minutes after the murder, and during that traffic stop, Smith, Faison, and Barksdale were captured on Officer Shepherd's body-worn camera together inside Smith's vehicle. Officer Shepherd noticed that Smith wore all black clothing and there was a ski mask around his neck. The evidence showed that Barksdale's phone was later found to have been within 215 feet of Ashburn's driveway at the time of the shooting and that Smith's phone was used to make Google searches about the murder just after 7:00 a.m. on the morning of the offense. Smith's phone then recorded additional searches related to the murder throughout November 2022. Additionally, a photograph of Smith bearing the inscription "IK [I know] what I did. Come get the job done already," was posted to Smith's Facebook profile on November 9, 2022. When taken into custody, Barksdale told detectives that Smith was the shooter and thereafter, when questioned, Smith told the detectives numerous lies regarding the incident. These circumstances, viewed in totality, are sufficiently probative of Smith's guilt, and from them a rational fact finder could conclude that Smith committed the murder.

Smith nevertheless argues that Barksdale was not a credible witness, that his story is not believable "as a matter of law," and that without it the evidence was insufficient to prove Smith committed the crime. He argues that by Barksdale's own admission Barksdale was the killer, his testimony contained numerous inconsistencies, and he lied. However, these facts were considered and resolved by the fact finder in favor of the Commonwealth, and it is well-settled that we must treat such findings with the greatest degree of deference.

"[T]he credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proven facts are matters solely for the fact finder's determination." *Fletcher v. Commonwealth*, 72 Va. App. 493, 502 (2020) (quoting *Crawley*, 29 Va. App. at 375). "When the law says that it is for triers of the facts to judge the credibility of a witness, the issue is not a matter of degree." *Swanson v. Commonwealth*, 8 Va. App. 376, 379 (1989).

> So long as a witness deposes as to facts which, if true, are sufficient to maintain their verdict, then the fact that the witness' credit is impeached by contradictory statements affects only the witness' credibility; contradictory statements by a witness go not to competency but to the weight and sufficiency of the testimony.

*Id.* "If the trier of the facts sees fit to base the verdict upon that testimony there can be no relief in the appellate court." *Id.* Thus, this Court must "accept the trial court's determination of the credibility of witness testimony unless, 'as a matter of law, the testimony is inherently incredible.'" *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006) (quoting *Walker v. Commonwealth*, 258 Va. 54, 70-71 (1999)).

"To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)). "Moreover, we cannot say that a witness's testimony is '*inherently* incredible [unless it is] so contrary to the

human experience as to render it unworthy of belief.'" *Grimaldo v. Commonwealth*, 82 Va. App. 304, 321 (2024) (alteration in original) (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011)). "In the absence of such extraordinary contradiction, we defer to the factfinder's conclusions on issues of witness credibility." *Id.*

Barksdale is Smith's older brother. He testified that, although he was on probation at the time of the offense, he had turned his own life around and was trying to "look out" for Smith, "calm him down," and "show him different ways." While hesitant to accuse his younger brother of committing the crime, when pressed Barksdale told Detectives Guice and Warejko that he, Smith, and Faison went driving aimlessly around in Smith's vehicle in the early morning hours of October 31, 2022. He testified that Smith eventually parked the car on a dark road in a residential neighborhood, had a brief argument with Faison, and then exited the car. Five minutes later, Barksdale got out of the car, heard an argument in the darkness somewhere nearby followed by one gunshot, and jumped back in the car. Barksdale said that within two minutes, Smith also entered the vehicle and quickly drove away. Barksdale's phone records verify that his phone was within 215 feet of Ashburn's house and that it moved rapidly away from the scene two minutes after the shooting. The autopsy report stated that Ashburn died of a single gunshot wound to the chest.

Barksdale also testified that Smith wore gloves and that he carried a 9 mm firearm. A 9 mm Blazer Luger cartridge casing was discovered in the roadway near Ashburn's body, and none of the latent fingerprints collected from Ashburn's vehicles were traceable to Smith. Barksdale confirmed that Smith was stopped for a traffic violation shortly after the murder and that Smith drove from there to the 7-Eleven. Surveillance from the 7-Eleven captured Smith's vehicle driving by and Barksdale walking into the store.

- 18 -

Barksdale's phone records, the 9 mm cartridge case found at the scene, Officer Shepherd's bodycam footage, the Flock camera system, the autopsy report, the latent prints analysis, and video surveillance from a YMCA and the 7-Eleven store all corroborated Barksdale's testimony and gave rise to an inference that his testimony was truthful. While Barksdale's testimony at trial and prior statements he made to detectives contained various inconsistencies and even outright lies, he nonetheless testified to events and circumstances that did, in fact, occur and that were verified by other evidence collected in the investigation of the case. We cannot therefore conclude that Barksdale's testimony was so manifestly false that reasonable men ought not to believe it. Instead, we find that, with the credibility of the witnesses resolved in favor of the Commonwealth, the totality of the evidence was sufficient to support Smith's conviction for murder. Thus, we leave the guilty verdict undisturbed.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*